In re **FOUR SEASONS SECURITIES LAWS LITIGATION** Opinion No. 2.
**M. D. L. Docket No. 55.**
**(All cases.)**

United States District Court,
W. D. Oklahoma.
Dec. 18, 1972.

------◆------

Marvin Cherner and J. Vernon Patrick, Jr., and Berkowitz, Lefkovits & Patrick, Birmingham, Ala., for plaintiffs Sher and Ginsberg.

Harry A. Young, Jr., and Neistein, Richman, Hauslinger & Young, Ltd., Chicago, Ill., for plaintiffs Fetman and others.

Ira Jay Sands and Robert B. Levin, New York City, for plaintiffs Fink and others.

Richard J. Stull and Stull & Stull, New York City, for plaintiff Nussbacher.

Thomas W. Kelly, Richard W. Lyon, and Breed, Abbott & Morgan, New York City, and John H. Cantrell and Cantrell, Douglass, Thompson & Wilson, Oklahoma City, Okl., for defendants Walston & Co. and others.

Arthur F. Mathews, Robert B. McCaw and Wilmer, Cutler & Pickering, Washington, D. C., and R. C. Jopling, Jr., Oklahoma City, Okl., for defendant Jack L. Clark.

William G. Paul, Harry A. Woods, Jr., Leonard Court, and Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., and Charles W. Boand and Wilson & McIlvaine, Chicago, Ill., for defendant Arthur Andersen & Co. and others.

J. D. Helms, James P. Linn and Linn, Helms & Kirk, Oklahoma City, Okl., for defendant Estate of Amos D. Bouse.

Lester A. Klaus and Hines, Klaus & Wilsey, Oklahoma City, Okl., for defendant Gray.

James W. Shepherd, Oklahoma City, Okl., for defendant Andrews.

Frederick Dorwart and Holliman, Longholz, Runnels & Dorwart, Tulsa, Okl., for defendant Crimmins.

Michael H. Rauch and Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendant McCollum.

John C. Harrington, Jr., and Lytle, Soule & Emery, Oklahoma City, Okl., for defendants Brown and others.

Thomas J. Kenan and George, Kenan, Robertson & Lindsey, Oklahoma City, Okl., for defendant Bankers Life Insurance Co. of Nebraska.

John W. Mee, Oklahoma City, pro se.

James P. Linn, Oklahoma City, pro se.

Melvin J. Spencer and Miller, Wilson, Adams & Spencer, Oklahoma City, Okl., for Don Nicholson, Trustee.

Edward I. Cohen, New York City, for objectors Goldwasser and others.

Robert C. Bailey and McClelland, Collins, Sheehan, Bailey & Bailey, Oklahoma City, Okl., for James R. Tolbert, III, Trustee in the Chapter X proceedings.

## OPINION NO. 2

### Approval and Confirmation of Settlement

THOMSEN, District Judge.*

This opinion sets out the reasons why the court has approved and confirmed, after notice and hearing, a settlement of the class actions filed in or transferred to this district and assigned to me for coordinated or consolidated pretrial proceedings under 28 U.S.C. § 1407,[1] and

---

* Of the District of Maryland, sitting by designation.

1. In re Four Seasons Securities Laws Litigation, 328 F.Supp. 221 (Jud.Pan.Mult.

of all claims which have been or could be asserted by or on behalf of the classes or any member thereof (except those who opted out) and which are specified in the notice to the members of the classes.

The actions were brought by persons who had purchased securities issued or guaranteed by Four Seasons Nursing Centers of America, Inc. (America), or Four Seasons Equity Corporation (Equity) and who claimed to have sustained losses as a result thereof.[2] The defendants in the several suits include officers and directors of America, officers and directors of Equity, Walston & Co., Inc. (the managing underwriter of the public stock offerings of America and Equity), some of Walston's officers and employees, Montgomery Company (a limited partnership composed of some of Walston's officers and stockholders), Arthur Andersen & Co. (the accounting firm which prepared and certified several audit reports), and others.

The settlement also includes certain civil actions and claims filed and assert-

ed by the Trustee appointed in the Chapter X proceeding for the reorganization of the Four Seasons companies pending in this court.[3] The settlement with respect to those claims has been approved by Judge Eubanks, after a hearing in the Chapter X proceedings.

Because the actions brought by a few plaintiffs who have opted out are still pending in this multidistrict proceeding (M.D.L. 55) and because grand jury proceedings are pending in the Southern District of New York, this opinion will include in the historical statement only facts which appear to be undisputed, unless the finding is preceded by a reference to the source, e. g. "The SEC report found". All facts stated herein are found only for the purpose of ruling on the settlement. The SEC report referred to is the Advisory Report of the Securities and Exchange Commission on the Proposed Plan of Reorganization, dated March 16, 1972, which was filed in the Chapter X proceedings.[4]

*Historical Statement*

America, a Delaware corporation, was organized on September 11, 1967, to en-

Lit.1971), and subsequent orders of the Panel.

2. The classes were variously defined in the several complaints and in counsels' statements of position on the class issue. For the purposes of the settlement they were defined in the order and notice, summarized under the heading "Settlement", below. They comprise, generally, all persons (with certain exceptions, e. g. defendants and partners of defendants) who at any time from May 9, 1968, to July 22, 1970, purchased or acquired securities or commercial paper issued by any of the Four Seasons companies and who suffered a loss thereon or after July 22, 1970, still owned any such securities or commercial paper.

3. The Four Seasons corporations involved in the reorganization proceedings are Four Seasons Nursing Centers of America, Inc. (America), Debtor, Four Seasons Overseas, N.V. (Overseas), Embassy Construction Co., Inc. (Embassy), National Medical Supply, Inc., Four Seasons Franchise Centers, Inc. (Franchise), subsidiaries of America, and Four Sea-

sons Equity Corporation (Equity), Debtor, and FSN Corporation (FSN), a subsidiary of Equity. Other "Four Seasons companies" referred to in the settlement papers, particularly the order and notice, include Four Seasons United, Four Seasons Investors, Four Seasons Nursing Centers of the West, Inc., Four Seasons Nursing Centers of the South, Inc., and other related or affiliated companies and partnerships. The outstanding common stocks of America and Equity were publicly held. America owned all the common stock of Overseas, Medical and Embassy, 80% of the common stock of Franchise and 30% of the common stock of FSN. Equity owned 20% of the common stock of Franchise and 70% of the common stock of FSN.

4. The findings and conclusions contained in that report have never been adjudicated, but the recommendation of the SEC that the pending plan of reorganization be approved, with certain amendments, was adopted in the Chapter X proceedings. The SEC also stated that it had no objection to the present settlement.

gage in the development, construction and management of nursing centers throughout the United States. Upon organization, it acquired the interests in twelve such enterprises owned by defendants Jack L. Clark, Amos D. Bouse,[5] and Tom J. Gray, who, since 1963, had been associated in the construction and operation of nursing centers. At the time of this acquisition, five nursing homes were in operation and two were under construction.

In exchange for their interests, which had an aggregate cost to them of $53,522 and an underlying book value of $500,000,[6] Clark, Bouse and Gray received 864,000 shares of America common stock. Walston & Co., Inc. (Walston), purchased 36,000 common shares for $45,000, and privately sold 100,000 shares of 6% convertible preferred stock for $1 million; half of those shares were taken by Montgomery Company (Montgomery), a partnership consisting of certain officers and stockholders of Walston. The preferred stock was converted into 300,000 shares of common prior to the second public offering of America common stock.

A vice-president of Walston (McCollum), together with Clark, Gray, Bouse and America's general counsel (Andrews), became the initial directors of America. Those persons remained the directors of America until shortly before the Chapter X proceeding, filed on June 26, 1970. Walston became the managing underwriter for America and for Equity and a co-underwriter for Overseas.

On May 9, 1968, America made its first public offering of 300,000 shares of common stock at $11 a share. About six months later, on November 26, 1968, it sold an additional 100,000 common shares at $58.50 per share. As a result of a two for one split in March 1969, the 1.6 million shares were converted into 3.2 million shares. Other non-public transactions increased the outstanding shares to 3,445,651 at the time of the Chapter X proceeding. Net proceeds to America from these offerings, after commissions, totaled $8,536,000. Included in the sales to the public were secondary offerings of 557,800 shares by the original stockholders. Net proceeds to them, after commissions, totaled $27,986,200. In both offerings, Walston acted as representative of the other underwriters.

The registration statement and the prospectus of the first public offering contained America's financials as of June 30, 1967, and December 31, 1967, with Andersen's certified audit report of April 15, 1968.[7] America's annual report for its fiscal year ended June 30, 1968, was delivered to America on August 21, 1968, and was released to the public in September or October. The registration statement and the prospectus of the second public offering contained America's

5. Amos D. Bouse died in 1971. His administrators have been substituted as parties defendant in those cases in which he was sued. Both Amos D. Bouse and his administrators will be referred to herein as "Bouse".

6. This figure is based upon the May 1968 America prospectus. Clark, Bouse and Gray were "selling stockholders" in that offering.

7. Andersen's certificate was in the usual form, namely: that their "examination was made in accordance with generally accepted auditing standards, and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances"; and that in their opinion "the accompanying consolidated balance sheet and consolidated statements of operations, retained earnings (deficit) and capital surplus present fairly the financial position of Four Seasons Nursing Centers of America, Inc. and subsidiaries as of December 31, 1967, and the results of their operations for the three years ended June 30, 1967, and the six months ended December 31, 1967, all in conformity with generally accepted accounting principles applied on a consistent basis after giving retroactive effect to the change (which we approve) in method of providing depreciation referred to in Note 6 to the consolidated financial statements."

financials as of June 30, 1968, with Andersen's audit report dated August 21, 1968, which included similar certificates to those set out in footnote 7 in the margin.

On November 12, 1968, America common stock was admitted to trading on the American Stock Exchange. It began almost immediately to rise sharply in price on heavy volume. By October 31, 1969, it had risen in price from $29.50 to $90.75 per share (adjusted for a two-for-one split).

On November 6, 1968, Equity and FSN were incorporated in Delaware. Prior to the organization of Equity, America had tried to sell to local investors the interests in the centers it or its predecessors had built.[8]

The public financing enabled America to initiate an extensive program for the construction of nursing centers, each of which generally was separately incorporated. In most cases the nursing centers, when completed, were under America's management pursuant to long-term contracts. As indicated in the prospectus of its first public stock offering, America was then managing 14 completed centers. It had nine under construction, had contracted for seven more, and had taken preliminary steps to develop an additional twenty.

America was expected to carry the costs through construction and to find permanent mortgage and equipment financing. The SEC report states that in addition, since a nursing center was not expected to be profitable for some time after its opening, America was obliged to advance substantial sums to cover the cash deficits of these centers; much of these advances ultimately proved uncollectible.[9]

The SEC found that America's ambitious program and its operating and other needs required substantial cash outlays, and that to meet these requirements it was necessary for America to increase its volume of sales and profits. America's reported revenues increased from $2.2 million in the year ended June 30, 1967 to $19.3 million in the year ended June 30, 1969. Reported net income increased from $300,000 to $2.7 million for the same periods, with a corresponding spectacular increase in per share earnings.

From the very beginning profits on construction, anticipated at 50% of actual costs, or better, were almost the sole source of America's reported earnings. Construction revenues for the year ended June 30, 1968 were reported as $5.25 million, as against costs of $3.25 million, or a gross profit, before overhead, of 60% of cost.

The SEC concluded that without bona fide sales, America was not in a position under established accounting principles to record these construction profits as income.

The SEC found that Equity and FSN were organized pursuant to an agree-

8. The SEC report states that such stock equity normally represented about 10% to 15% of the total price, and in some instances less; the sale efforts were only partially successful; America retained 100% of the equity in one of the fourteen centers under its management, 50% in three, and 30% in two.

9. America's other corporate activities included its supply division, which performed centralized purchasing and warehousing services for the managed centers, and the management division. Shortly before the Chapter X proceedings, America organized Medical, a wholly-owned subsidiary of America, to engage in the medical supply business and to serve the centers under America's management and any other customers. The Chapter X proceedings brought this venture to an abrupt end.

Embassy was organized in 1968 to engage as contractor on behalf of America in those states in which America did not wish to undertake construction directly. The SEC report states that Embassy had virtually no capital of its own, and in its operations it incurred substantial construction liabilities for which it was to be reimbursed by America.

ment, dated November 4, 1968, entered into by America, Clark, Bouse and Gray, with four individuals who became the sole directors of Equity. Their principal offices were in Oklahoma City, as was America's.

Equity issued initially 120,000 shares of common stock at $11 per share. One-third of these shares were issued to Equity's four directors, the remaining two-thirds to America, Clark, Bouse and Gray. It was agreed that the latter shares were to be non-voting while held by them.

On February 27, 1969, Equity sold publicly, through Walston, 545,000 shares of its common at $11. At the same time it also sold to 14 institutional investors 135,000 shares and $714,000 principal amount of 6½% junior subordinated convertible debentures. Net proceeds to Equity from these offerings were $7.9 million, after underwriters' commissions.

Andersen had prepared a report on examination of Equity's balance sheet as of December 3, 1968, and another as of February 14, 1969. The latter statement, certified in the customary manner, was included in the Equity prospectus. Andersen also (a) prepared and delivered on July 22, 1969, their auditor's report on examination of Equity's balance sheet as of June 30, 1969, and a consolidated balance sheet and related statements for Equity and subsidiaries as of June 30, 1969, which was released to the public about September 11, 1969, and (b) prepared and delivered on September 9, 1969, a report of examination of America's consolidated balance sheet and related statements as of June 30, 1969, which was promptly released to the public.[10]

FSN was to serve as a joint subsidiary of Equity and America, Equity taking 70% and America 30% of its $1,000 capital stock. Title to completed nursing centers was to be transferred to FSN by America and Equity, from time to time, as security for 7½% first mortgage notes, maturing July 1, 1987, to be issued by FSN as part of the permanent financing of these nursing centers. These notes would be issued under an open-end indenture, all notes being secured by a blanket mortgage. The notes would be fully guaranteed by Equity, America's guarantee to be limited to 30%.[11]

In the year and half of their joint corporate activities, about 100 projects were initiated by America and Equity. By June 26, 1970, the date of the Chapter X proceeding for America, 25 joint nursing centers were completed and in operation and at least as many under construction. In addition, 31 sites had been acquired and others were under contract with escrow deposits. These properties represented an investment of about $43 million in land, buildings and equipment.

The SEC concluded that aside from their role in supplying some of the financing, Equity and FSN contributed little to this massive venture. Its report stated that the directors of Equity and FSN acknowledged that they had no previous experience in this business, and neither Equity nor FSN attempted to de-

10. The annual reports of America and Equity were released to the public on October 31, 1969.

11. The SEC found that the preorganization agreement of November 4, 1969, was linked to mortgage commitments from the same 14 institutional investors who purchased the debentures and part of the stock of Equity; the commitments, terminating June 30, 1971, were for the purchase of not more than $19.5 million of mortgage notes. The investors agreed to buy FSN 7½% mortgage notes for 62% of the lesser of the amount determined, inter alia, by the actual cash expenditures for the completed nursing centers conveyed to FSN or the appraised value thereof. Clark, Bouse and Gray agreed to buy FSN 7½% subordinated notes for 13% of such amount. America and Equity agreed to provide the remaining 25% by the purchase of additional stock, 70% thereof by Equity and 30% by America.

velop its own staff or organization; that Equity dealt only with America, and typically each project was organized as a general partnership between them.

Under the standard partnership agreements, America was employed as general contractor to construct the facility and to supply the equipment, both at a profit, and to use its best efforts to secure the necessary financing commitments. The SEC report stated that America was appointed "Governing Body" with exclusive authority over all aspects of center management and operation at a specified fee, and the partnership itself, meaning Equity, was expressly excluded from participating in any phase thereof; that America was also designated to prepare and keep custody of all partnership records, books and operational data; that the only matter expressly left to mutual agreement was the selection of the site, but America was designated to make the market survey to determine the feasibility of the project.

Under the partnership agreements for each facility, Equity and America were to share in the profits and losses of the partnership, 70% for Equity and 30% for America. This is the same ratio in which the contribution to capital was fixed for the two partners.[12]

The SEC found that America, in its various capacities, dealt directly with creditors and suppliers in almost all phases of the operations and was initially responsible for payment of most of the costs, some land purchases being the principal exception. By far the largest expenditures were for construction, and under the construction contract with each partnership America was to receive progress payments on the contract price in five equal instalments, based on specified stages of completion. Its initial practice was to bill Equity for 70% of each earned construction instalment, which was usually remitted by Equity until it substantially exhausted its cash resources in November 1969. America billed 100% of its construction charges to the partnership center.

The SEC further found that the billing procedure soon broke down, due partly at least to malfunction of America's accounting system; that in preparing financial statements for the six months ended December 31, 1969, both companies found it necessary to adjust their book accounts by more than $10 million for unbilled construction; that at about this time, Equity ceased to record deficiencies in its partnership contributions; and that almost six months of intercompany liabilities were simply omitted from its books at the time the Chapter X proceedings began in June 1970. Nevertheless, construction profits continued to be the primary source of reported earnings of America until the Chapter X petition was filed. The other divisions made only a negligible contribution to earnings.

During the period from May 1968 through March 1970, Clark made many optimistic statements with respect to the projected earnings of America, which were not realized. These statements were published in various newspapers and included in market letters of broker-dealers recommending America stock.

Andersen prepared and delivered on March 22, 1970, its auditor's report on examination of Equity's balance sheet as of December 31, 1969; it was released to the public on March 30, 1970. It does not appear that a report of examination of America's balance sheet as of December 31, 1969, was ever released.

On April 29, 1970, America issued a release to the public that a loss was expected for the quarter ended March 31, 1970.[13]

12. In three instances in which outside investors were brought in, Equity's ownership was reduced accordingly. The project was either incorporated or continued as a partnership with the outside investor participating as a limited partner.

13. Clark takes the position that the loss resulted from (1) America's decision to

The next day, April 30, the American Stock Exchange suspended trading in America stock. On May 12, 1970, the SEC ordered the first of a series of 10-day suspensions of trading.

After an investigation, the American Stock Exchange issued on March 1, 1971, a report dealing with "three possible violations" by Walston.[14] It is not necessary for this court at this time to set out or summarize the contents of the report or Walston's response, beyond stating: (a) that the report includes certain statements of fact, evidence, inferences and conclusions, which, if true and justified, would lend support to some of the claims made against Walston and other defendants by the plaintiffs in these class actions; and (b) that the reply contains certain statements of fact, evidence, inferences and conclusions, which, if true and justified, would lend support to the defense against those claims.[15]

### The Chapter X Proceedings

The Chapter X proceedings were filed with respect to America on June 26, 1970, with respect to Equity on July 22, 1970,

reflect promptly a change in its "theretofore generally accepted" accounting procedures and to offset against third quarter earnings all previously recognized income from franchise fees, and (2) unanticipated cost overruns on construction sites in the Midwest coupled with possible embezzlement of company funds in the Chicago area.

14. The "three possible violations" were referred to by Walston in its reply as "charges of wrongdoing" and were summarized in that reply as follows:

"FIRST: That in and during the period December 1969 to April 1970 Walston, having confidential, non-public material information concerning [America] which was substantially adverse and unfavorable to that company engaged, by reason of such inside information, in a program of stock disposition, including acting as selling broker for certain 'insider' accounts.

"SECOND: That in a period prior to January 8, 1969 when [America] announced a stock split, and in a period prior to April 7, 1969 when [America] announced a franchise program, Walston, having confidential, non-public material information concerning that stock split and franchise program (including information secured at a meeting on January 13) engaged, by reason of such inside information, in a program of stock acquisition.

"THIRD: That Walston failed to take action in compliance with admonitions of Amex."

Walston undertook to show in its reponse to the report that the three charges were "totally unsupported by the evidence" and were "incorrect". The charges have never been adjudicated, but were disposed of by an agreement between Walston and Amex.

15. Charges were also filed by the Exchange against Frank J. Crimmins, a vice president of Walston, in charge of one of its New York offices. One of the charges was summarized by Crimmins in his reply as follows: (a) that "as a matter of law, a special relationship between Walston, Crimmins and * * * [America] * * * existed. From or because of this special relationship, it is alleged that Mr. Crimmins had an obligation to the customers of Walston, to the investing public and to the Exchange to avoid engaging in activities which could be construed as serving his own self-interest and the special interests of Walston" and (b) that "solicitation and concerted activities to promote interest and market activity in the stock of [America] engaged in by Mr. Crimmins, to the extent disclosed in the Report, coupled with his direct and/or indirect substantial position in [America] stock, tended to serve and enhance his own personal interest and the special interest of Walston and was in direct conflict with the obligation purportedly created by the alleged special relationship." Crimmins answered the charges, and they have never been adjudicated.

Again, it is not necessary for this court at this time to do more than state (a) that the report includes certain statements of fact, evidence, inferences and conclusions, which, if true and justified, would lend support to some of the claims made against Crimmins and other defendants by the plaintiffs in these class actions; and that the reply contains certain statements of fact, evidence, inferences and conclusions, which, if true and justified, would lend support to the defense against those claims.

and with respect to other Four Seasons corporations during July, August and October 1970. All were consolidated.

A plan of reorganization of the corporations was prepared by the Trustee, which, with certain amendments, was considered at a hearing in November 1971. Thereafter the Trustee proposed a second amended plan. On March 17, 1972, the SEC filed its advisory report on the proposed second amended plan, approving the plan generally, but suggesting a few modifications.[16] As a result of those suggestions, a Second Amended Plan of Reorganization (Restated) was filed on March 21, 1972, and Judge Bohanon entered (1) an order approving the restated plan, setting a date for hearing on confirmation of the plan and objections thereto, and providing for notice of the restated plan and of the hearing to be sent to creditors, stockholders and other interested parties, (2) an opinion and order approving the compromise and settlement of the Class G claims (defined in the plan, set out below herein), and (3) an order establishing procedures for filing Class G claims, approving forms, fixing a bar date, directing notice, etc. The hearing was held, objections were heard, and on July 17, 1972, Judge Bohanon entered an order confirming the Trustee's Restated Plan, hereinafter referred to as "the plan".

The plan provides for the transfer of all the assets of the debtors and of all partnerships and corporations in which they are the sole partners or shareholders, to a reorganized company (Anta).

Anta assumes the remaining mortgages and certain lease obligations, upon terms agreed upon with this group of creditors.[17]

Unsecured creditors of all the debtors, referred to as "Class C creditors", receive one share of Anta stock for each $7 principal amount of allowed claims.[18]

Holders of outstanding shares of America or Equity, and holders of warrants to buy shares of America, Equity or Franchise are not considered Class C creditors. The plan is based upon the conclusion that America and Equity are insolvent and that the warrants of Franchise are without value.

The plan provides for an offer of settlement to "Class G—Creditor Stockholders", defined as persons who (1) purchased stock or other securities of debtors (either directly from debtors or in the securities markets) on or before July 22, 1970 (the date of the filing of the Chapter X petition by Equity), and (2) filed claims, in a manner and within the time fixed by the court in the order approving the plan, for the amount of the loss suffered by them, the loss being defined as the excess of amounts paid by them for all such purchases, over the amounts realized by them from all sales of such securities. The plan set aside a number of shares of Anta stock equal to one-half of the number of shares issued to unsecured creditors, and will distribute such shares (i. e. one-third of all Anta stock) among the Class G claimants in proportion to the amount of losses claimed and allowed. The number of Anta shares to be distributed for each dollar of loss thus depends on the total amount of claims for losses filed and allowed.[19]

The Class G claimants, therefore, are generally the same persons who comprise the class or classes sought to be established in the class suits involved in M.D.L. 55. Class G claims in a total

16. Pursuant to Section 173 of Chapter X, 11 U.S.C. § 573.

17. It also assumes operating liabilities incurred during the proceedings.

18. Except that claimants holding unsecured claims aggregating $200 or less will be

paid such amount in cash. No fractional shares will be issued, but will be paid in cash at the rate of 80% of the fractional interest in one share.

19. The amount of shares to be distributed to any claimant may not exceed one share for each $7 of loss.

amount of approximately $110 million have been filed with the Trustee in the reorganization proceeding.

The Trustee retained, for prosecution all causes of action belonging to the debtors.

The SEC noted in its March 16, 1972, report that the stock of Anta to be received by unsecured creditors under the plan had an estimated value of $21 million (which was about 80% of their claims, exclusive of post-bankruptcy interest), whereas the Class G claimants received stock of Anta having an estimated value of $10.5 million in settlement of claims against the debtors of a little over $100 million. Nevertheless, after a full discussion of the problems involved, the SEC concluded:

> " * * * All facts considered, we think that the trustee's offer of settlement is a practical proposal that under Chapter X standards the court may approve in the interest of a prompt reorganization and as fair to all persons affected by this settlement." [20]

Two appeals were taken from the order of the bankruptcy court approving the plan—one by Lowell S. Fink et al., plaintiffs in two of the class suits in M.D.L. 55, the other by Charles O. Finley. The appeal by Fink et al. is being dismissed as part of the M.D.L. 55 settlement.[21]

As noted at the beginning of this opinion, the settlement now under consideration includes not only the claims involved in the M.D.L. 55 class suits, but also the claims of the Chapter X Trustee against many of the same defendants. After the hearing on November 16–17, 1972, in M.D.L. 55, this court stated that it would approve and confirm the settlement, and on November 21, 1972, after a hearing in the Chapter X proceeding, Judge Eubanks confirmed the settlement of the Trustee's claims.

## M.D.L. 55

Ten actions—seven of which claimed to have been brought on behalf of all purchasers of stock of America or Equity or both who suffered a loss—were brought in or transferred to this district and assigned to me by the Judicial Panel on Multidistrict Litigation for coordinated or consolidated pretrial proceedings under 28 U.S.C. § 1407 on May 21, 1971.[22] Nine additional cases have been similarly transferred.

Each action named a different set of defendants, but Clark, Bouse, Gray, Andrews, McCollum, Walston & Co., Inc., Montgomery Company and Arthur Andersen & Co. have been named as defendants in most of the cases which seek to be treated as class actions. Altogether 40 individuals, partnerships and corporations have been named as defendants in one or more actions, not counting the efforts to establish several defendant classes, which would add hundreds of additional defendants.

In one or more of the complaints claims were asserted against some or all of the defendants under §§ 5, 11, 12 and 17(a) of the Securities Act of 1933, under §§ 9, 10(b) and 20 of the Securities and Exchange Act of 1934, and under Rule 10(b)(5) of the SEC.[23] One or

---

20. The SEC added: "It should be noted that the settlement does not call for any release of the defendants other than the debtors. Claimants will remain as free as heretofore to pursue the class suits against such other defendants, but with one-third of the reorganized enterprise securely tucked away in their pockets."

21. The parties to the settlement agreed to proceed despite the refusal of Finley to dismiss his appeal, but made this settlement null and void if its approval by this court in M.D.L. 55 or by the judge in the Chapter X proceeding is vacated or reversed in whole or in part on appeal.

22. In re Four Seasons Securities Laws Litigation, 328 F.Supp. 221 (Jud.Pan. Mult.Lit.1971).

23. The claims may be summarized as follows: that—

(a) In connection with the sale of securities or commercial paper of America, Franchise, Overseas, Equity, FSN, and related or affiliated companies, the de-

more included a common law claim and derivative claims. The derivative claims were dropped after the Trustee in the Chapter X proceedings filed actions against various defendants.

A first pretrial order,[24] dated May 28, 1971, provided for the practice and procedure in the consolidated cases, stayed discovery proceedings until further order of the court, tolled certain time requirements, including the time for filing responsive pleadings, and called for a preliminary pretrial conference on July 20, 1971.

At the July 1971 conference, counsel for the respective parties stated their positions. It was the general consensus and the court ordered that all discovery or other pretrial proceedings should be stayed until further order of the court, except specified document discovery and interrogatories. The next pretrial conference was scheduled for November 18, 1971. The permitted discovery was conducted.

At the November 1971 conference, counsel for Sher had different ideas from counsel for Fink et al. and counsel for Fetman et al. as to the desirable method of procedure. Counsel for Sher wished to proceed rapidly to trial on the theory of a single conspiracy *ab initio;* counsel for Fink wished to press separate claims or causes of action under various sections of the 1933 and 1934 acts, including claims for market manipulation, which would complicate and delay the progress of the cases, but might result in holding a larger number of defendants. Counsel for the several plaintiffs and defendants differed sharply in their views with respect to the proper class or classes. It was apparent that additional discovery and briefing would be needed before this court could fairly decide what classes should be established and for what purposes. It was generally agreed that a schedule for (a) discovery on the class issue, (b) statements of position on the class issues by all counsel, (c) replies to such statements, and (d) a hearing thereon, should be established. As tight a schedule as was reasonably possible was established by court order and enforced with few exceptions.

During the next few months the court heard arguments on the discovery of certain classes of documents, and made the necessary rulings.[25]

Meanwhile, in January 1972 counsel for three plaintiffs or groups of plaintiffs seeking to represent a class or classes were given conditional leave to file amended complaints, reserving the right to all parties to object to the proposed amendments. Several plaintiffs filed such amended complaints, some adding additional defendants, further complicating the class problem. In his amended complaint, objections to which have not yet been heard, plaintiff Sher seeks to add as a defendant class all persons who were partners of Arthur Andersen & Co. at any time during the period from May 9, 1968, to May 13, 1970. There are hundreds of such persons, in many countries. The court has not ruled on the troublesome question

---

fendants employed devices, schemes, and artifices to defraud and engaged in acts, transactions or a course of business which operated as a fraud or deceit upon the purchasers of such securities or commercial paper;

(b) registration statements, prospectuses, financial statements, and other material published and made available to stockholders and the public contained untrue statements of material facts and omitted to state material facts necessary .in order to make the statements made not misleading, with respect to America,

Franchise, Overseas, Equity, FSN, and related or affiliated companies; and

(c) certain of the defendants engaged in a conspiracy to defraud investors with respect to America, Franchise, Overseas, Equity, FSN and related or affiliated companies.

24. Generally similar to Sample Pretrial Order No. 1, Manual for Complex and Multidistrict Litigation, pp. 161, 162.

25. See, e. g., ruling on the production of certain documents in the possession of the SEC, D.C., 54 F.R.D. 527.

whether a class of defendants can be sued for damages, with service only on a representative selected by the plaintiff, nor on other questions which will arise if classes of defendants are permitted.

Because claims of attorney-client privilege had been asserted, the court ordered that limited depositions of defendants Clark and Andrews [26] be taken in open court on May 1. The court believes that these depositions helped all parties appraise the settlement value of the cases.

After the depositions a further conference was held, with respect to discovery motions and related questions, the authentication of documents, the effect of the proposed reorganization plan in the Chapter X proceedings, and other matters.

Early in May Fink was conditionally allowed to file, subject to objections, a third amended complaint. Among the parties sought to be added by Fink were four of the largest broker-dealers in the country, joined on a claim of market manipulation by them, and other defendants.[27] In the titling of his third amended complaint, plaintiff Fink lists among the defendants "Arthur Anderson & Co., A Co-Partnership, Marvin Hambrick and Kenneth J. Wahrman, individually and as representatives of a Class consisting of 800 or more individual partners of Arthur Anderson & Co., Walston & Co., Inc., individually and as representative of a class of underwriters who participated in the public sale and distribution of common stock of Four Seasons Nursing Centers of America, Inc., pursuant to Prospectus dated May 9, 1968 and November 26, 1968, Montgomery & Co., a limited partnership, Glenn R. Miller, individually and as representative of a Class consisting of limited partners of Montgomery & Co." In the body of the complaint, however, under the heading "defendants", Fink lists and identifies Arthur Andersen & Co., Marvin Hambrick, Kenneth J. Wahrman, Walston & Co., Inc., Montgomery Company, and Glenn R. Miller, but makes no reference to any of them as representatives of a class of defendants, and although he sometimes asserts claims against "all defendants", he does not refer in any way to a class of defendants in the body of the complaint. He asserts claims under various sections of the Securities Acts, as well as Rule 10b(5), and retains his common law claims.

During May and June counsel for many of the parties filed statements of position on the class issue, pointing up the many problems involved. There was little agreement among them with respect to the proper classes.

From June 19 through June 22 a conference was held, at which the possible and proper classes and the problems raised by the proposed addition of the four broker-dealer defendants were discussed. The court ordered that another conference be held on July 17.

That conference was held on July 17–20. Counsel for Fink was allowed to drop the four large broker-dealers from his conditionally allowed third amended complaint, without prejudice.

After further argument on the class problem, as to which counsel for the various parties took widely varying positions, the court stated that it was willing to enter an order, hammered out by court and counsel during the conference, which would, in effect, designate five actions as class actions and conditionally, preliminarily and tentatively divide the persons for whose benefit the cases purport to be brought, solely for pretrial and discovery purposes, into two classes,

---

26. Andrews had served as counsel for several individuals and entities.

27. Also sought to be added by Fink was Francis R. Santangelo, the designated American Stock Exchange specialist on America, who was sued individually and as a partner of L. D. Babcock & Co.

set out in footnote 28 in the margin, subject to the right of the court to modify or withdraw such designation and division at any time prior to decision on the merits. The proposed order included the findings required by paragraphs (a) and (b)(3) of Rule 23, F.R. Civ.P., but added the provisions set out in footnote 29 in the margin. The proposed order also contained provisions for notice to all members of the classes, advising them of their right to opt out and other necessary matters. See Rule 23 (c)(2).

All counsel present then advised the court that they were engaged in very serious settlement negotiations, and asked the court to hold up the entry of the proposed order for a brief period, to permit them to continue their negotiations. They convinced the court that, in view of all the circumstances of this case, it would be fairer to the thousands of members of the potential classes, as well as the parties presently represented by counsel in the cases before the court, to let them know the terms of a proposed settlement before requiring them to decide whether or not to opt out.[30]

28. "(1) All persons (other than defendants named in any of said cases, including the partners of any of said defendants) who at any time from May 9, 1968, to July 22, 1970, inclusive, purchased or acquired securities issued by Four Seasons Nursing Centers of America, Inc., Four Seasons Francise Centers, Inc., or Four Seasons Overseas, N.V., and who suffered a loss thereon or still owned any such securities after July 22, 1970;

"(2) All persons (other than defendants named in any of said cases, including the partners of any of said defendants) who at any time from November 6, 1968, to July 22, 1970, inclusive, purchased or acquired securities issued by Four Seasons Equity Corporation, and who suffered a loss thereon or still owned any such securities after July 22, 1970."

29. "This Court reserves and defers a determination of the specific cases, claims or questions of law or fact which qualify for class action treatment under Rule 23 for purposes other than discovery.

"This order is entered without prejudice to the rights of the parties to renew or otherwise assert, in connection with any reformulation of class definitions, the creation of new classes or of subclasses, the finalization of classes for purposes of trial or otherwise, any and all objections, claims or contentions they may have with respect to the issues of class definition and class representation in these proceedings. This order is also entered without any determination of, and with full reservation to the parties of the right to press or resist all applications, motions or objections hereafter filed or presently pending, including, inter alia, those relating to: (a) whether as to any claim, complaint or cause of action a valid claim

is stated; (b) whether any valid defense of the Statute of Limitations is available; (c) whether any complaint may be amended or new parties added to pending complaints; (d) whether any class of defendants may be approved for class action treatment pursuant to Rule 23; (e) whether any approval for class action treatment pursuant to Rule 23 may be approved or authorized as respects recently named new defendants, including Frank Crimmins, Francis R. Santangelo, and L. D. Babcock & Co."

30. Wright and Miller, in their Federal Practice and Procedure: Civil, § 1786, at p. 145, state:

"Rule 23(c)(2) does not specify when the required notice should be given. Generally, however, it should be sent as soon as the court determines that a class action is proper under subdivision (c)(1) so as to provide the absentees with a full and meaningful opportunity to intervene to protect their rights or to opt-out. Although the timing of the notice has little or no practical effect on the class members' ability to exclude themselves from the action, inasmuch as that is preserved until the date specified in the notice, the right to enter the action may be substantially impaired if the absent parties are not notified of the suit's existence until shortly before a judgment is entered.

"In some cases the court may decide to postpone giving formal notice under Rules 23(c)(2) if there is reason for the delay and it would not prejudice those class members who are not before the court. * * *"

In this case the court has never felt that it was or is possible, without considerable additional discovery and argument on many issues, to determine what,

## The Settlement

During most of the next two months counsel for the several parties engaged in long and difficult settlement negotiations, which finally resulted in an agreement, which was embodied in an order, notice and accompanying documents. The order, conditionally approving the proposed settlement for submission to the members of the classes established by the order for the purpose of effectuating the proposed settlement, and the notice attached to the order as an exhibit, were signed by the court on September 21, 1972, after a hearing. The classes so established by the order were:

1. All persons (other than the Four Seasons companies, the Trustee thereto, the reorganized company, its subsidiaries and affiliates, defendants named in any of these class actions, and the partners of any of said defendant partnerships) who at any time from May 9, 1968 to July 22, 1970, both inclusive, purchased or acquired securities or commercial paper issued by America, Franchise, or Overseas, and who suffered a loss thereon or after July 22, 1970, still owned any such securities or commercial paper;

2. All persons (with the same exceptions) who at any time from November 6, 1968, to July 22, 1970, both inclusive, purchased or acquired securities or commercial paper issued by Equity or FSN, and who suffered a loss thereon or after July 22, 1970, still owned any such securities or commercial paper.

The court found and determined that for the purpose of effectuating the proposed settlement, the pre-requisites set out in Rule 23(a) and (b)(3) were met with respect to each of the two classes established by the order.

James R. Tolbert, III, the Trustee of America, Franchise, Overseas, Equity, and FSN, was authorized and directed to mail, on or before October 2, 1972, notice and proof of claim forms [31] to each member of the classes whose identity and address was known to him or whose name was furnished to him by any of the parties, at such member's last known address, and to cause the notice to be published once, on or before October 6, 1972, in the national edition of The Wall Street Journal.

Pursuant to Rule 23(c)(2), F.R.Civ. P., the court found that the notice to be given to members of the classes as directed by the order was the best notice practicable under the circumstances, that adequate provision had been made for individual notice to all members of the classes who could be identified through reasonable effort, and that such notice met all requirements of Rule 23.

The settlement may be summarized as follows:

(a) For purposes of effectuating the settlement, the Fetman, Fink (2 cases), Ginsberg and Sher actions shall be maintained by the plaintiffs therein as class actions on behalf of the classes listed above.

*if any*, class or classes may properly be established for a trial or trials. The parties were in general agreement that the cases had not yet reached a point where defendants should be required to file their answers or other responsive pleadings, because it was felt that arguments on questions raised by pleadings at this stage of discovery would be premature. The discovery which has heretofore been conducted was for a limited purpose, and could properly be conducted without establishing classes. The further discovery—principally depositions of many witnesses, which would be taken were it not for the

settlement—would require the establishment of tentative classes for limited purposes. The court was prepared in July 1972 to establish such tentative classes and to notify potential class members of that action. However, since a settlement was imminent, it would have been unfair to the class members to require them to decide whether or not to opt out without telling them about the proposed settlement.

31. In substantially the same form as Exhibits C, D–1 and D–2 to the order.

(b) The settlement includes all claims which have been or could be asserted by or on behalf of the classes, or any member thereof, arising out of or relating to any act or omission relating to the Four Seasons companies, and other related or affiliated companies, or relating to the business, management or financial statements of any of the Four Seasons companies, or transactions in the securities or commercial paper of any of the Four Seasons companies, prior to the date of entry of the final judgment provided for in the order, whether or not asserted in the class actions.[32]

(c) The settlement of the class actions is made in conjunction with and contingent upon the settlement of four plenary actions instituted in this court by the Trustee in the Chapter X proceedings.

(d) In settlement of the class actions and the Trustee actions, certain of the defendants or persons on their behalf have severally agreed, subject to the terms and conditions of the order, to contribute various amounts towards the settlement aggregating $8.5 million in cash (the Settlement Fund) and to release or procure the release of certain claims aggregating in excess of $1 million heretofore filed against the debtor estates in the Chapter X proceedings. Walston has also agreed to release and discharge such outstanding debt balances as are presently due and payable and have not been heretofore actually paid to Walston in any existing customer's account of Walston, but only so far and to the extent that such debt exists by reason of the purchase by such customer, from or through Walston, of securities of America or Equity.[33] Of the $8.5 million, the amount of $7 million (the Class Settlement Fund) is to be paid in settlement

of the class actions, and $1.5 million is to be paid to the trustee, together with the release of the claims against the debtor estates referred to above, in settlement of the trustee actions.[34]

(e) The Plan of Distribution of the Class Settlement Fund, set out in the notice, contemplates that:

"(a) Distributions will be made to claimants whose claims are allowed by the Court, in the proportion that the allowed claim bears to the aggregate of all allowed claims.

"(b) Any Class 'G' claim heretofore filed in the reorganization proceedings by any member of the classes may, if the claimant so elects, be incorporated by reference in these proceedings;

"(c) Each claimant will be required to offset, against his losses on purchases from May 9, 1968 through July 22, 1970 of securities or commercial paper of America, Franchise, Overseas, Equity and FSN, any profits realized thereon;

"(d) Any Class C creditor in the reorganization proceedings whose claim is based upon debentures, notes or other debt-type securities of America, Franchise, Overseas, Equity, or FSN shall be deemed to have received a dividend on his claim equal to 90% of the face amount of such debt securities by virtue of the provisions in the Plan of Reorganization for distribution of stock of the reorganized companies;

"(e) All equity securities heretofore issued by America, Franchise, Overseas, Equity or FSN shall be deemed to have no value; and

"(f) No claim for interest shall be allowed."

32. The order and notice then summarized the claims which had been asserted in the class actions. See footnote 23.

33. On September 21, 1972, this amount was believed to be about $385,000. The court is now advised that it will probably be about $500,000.

34. The Trustee advised the court that the proposed settlement will materially expedite the termination of the Chapter X proceedings and will enhance the value of shares of the reorganized company to be distributed pursuant to the plan of reorganization heretofore approved by the court in the Chapter X proceedings.

The claim of the Class G creditors in the Chapter X proceeding had also required netting.

The notice contains the requirement that proof of claim forms be filed by January 3, 1973.

(6) Upon final approval of the settlement, the judgment to be entered in M.D.L. 55 will:

(1) Dismiss without costs, with prejudice and on the merits: each and all of these class actions and all settled claims as to all members of the classes who have not duly and timely requested exclusion therefrom; all other actions in M.D.L. 55 brought by consenting plaintiffs and by any other plaintiff who is a member of either of the classes and has not duly and timely requested exclusion therefrom (opted out); and the derivative causes of action in all M.D.L. 55 cases;

(2) Require each member of the classes who claims a right to participate in the Class Settlement Fund to execute and deliver, as part of his proof of claim, a release in the form contained in exhibits to the order;

(3) Bar forever the prosecution against the defendants or anyone else of any and all settled claims by any member of the classes, except by those who have opted out;

(4) Bar all members of the classes who opt out from instituting, maintaining or participating in any class action against anyone which asserts or relates to any or all of the settled claims. (This provision does not prevent those who opt out from maintaining individual actions asserting their claims against any-

one, including the defendants who are contributing to the settlement.);

(5) Provide that plaintiffs' attorneys of record in these class actions shall not in any proceeding or litigation represent any person who asserts against any defendant herein or anyone else any claim arising out of or relating to the subject matter of any of the settled claims; and

(6) Provide that the Court shall have and retain jurisdiction to allow attorneys' fees and disbursements to plaintiffs in the class actions and their counsel, and to deal with matters relating to the class settlement and plan of distribution.

The order and the notice also (1) set a date and method by which members of the classes who desired to be excluded therefrom in these class actions might opt out; and (2) set a date and place for a hearing (a) to determine whether the proposed settlement and the plan of distribution are fair, reasonable, equitable and adequate, and should be confirmed, (b) to pass on applications for fees and allowances in connection with the settlement, and (c) to take other action contemplated by the order.[35]

The Trustee duly mailed the notice and proof of claim forms (16,199 in all) to each member of the classes whose identity and address was known to him or whose name was furnished to him by any of the parties, and furnished on request 12,000 additional copies to various persons, firms and corporations, including securities brokers, and caused said notice to be duly published in The Wall Street Journal.[36]

On or before November 9, 1972, approximately 2,539 proofs of claim had

35. The order also contained certain conditions (which are no longer important), housekeeping provisions, and provisions with respect to the rights and obligations of the defendants inter se.

36. At the request of various defendants in the class actions who are also defendants in certain other actions relating to transactions in the securities or com-

mercial paper of the Four Seasons companies, the Trustee timely served by registered mail a copy of the order and its exhibits, including the notice annexed thereto, upon all named plaintiffs or third party plaintiffs in the seventeen transferred, tag along, or related actions. The Trustee forwarded all inquiries from members of the classes and others to counsel designated by the court for reply.

been received by the Trustee, representing claims (which have not yet been processed) aggregating approximately $22,565,264.

The Trustee mailed forms for requesting exclusion from the classes to each person who asked for them.

Twelve written requests for exclusion from the classes [37] were filed with the Clerk on or before November 1, 1972. Such persons appear to have aggregate potential claims of approximately $500,-000, and have effectively exercised their right to be excluded from the classes. No other requests for exclusion from the classes had been filed with the Clerk through November 15, 1972, except one ambiguous set of papers filed by counsel for the Bank of America, as trustee of a trust, which will be considered by the court at a later date.

All conditions of the proposed settlement set forth in the order were met or waived except matters to be performed after final judgment herein.

*Hearing on Confirmation of Settlement*

On November 16 and 17, 1972, the hearing called for by the order and notice was held. No persons appeared at the hearing and objected to the proposed settlement except Edward I. Cohen, Esq., representing himself and seven other persons claiming to be members of one or both of the classes, none of whom has requested exclusion from the classes, and who appear to have aggregate claims, computed in accordance with the order, of approximately $300,000. No other member of either of the classes objected to the proposed settlement at or prior to the hearing, either orally or in writing; but one man, who was a selling

shareholder in the November 1968 public offering of America and who has filed no claim in the Chapter X proceedings, objected to the proposed settlement without stating any reason for his objection.

At the hearing the evidence offered in support of the proposed settlement included, inter alia, the entire court file and record in this M.D.L. 55 proceeding,[38] and, in addition, a copy of the Second Amended Plan of Reorganization (Restated), the Advisory Report of the SEC on Proposed Plan of Reorganization, a copy of the order in the Chapter X proceedings confirming the Second Amended Plan of Reorganization (Restated), and the order and opinion of the court in the Chapter X proceedings approving the compromise of the Class G claims.

The court admitted all evidence offered and not withdrawn voluntarily by counsel for objectors, including a report of investigation by the American Stock Exchange (Amex).[39]

The court also admitted, at the request of proponents and without objection, separate replies by Walston & Co., Inc., and Frank Crimmins to the Amex report, and a verified "response" filed by counsel for Sher and Ginsberg, for the purpose of correcting certain alleged "errors and misconceptions" in the memorandum filed by Cohen.

Counsel for the trustee in the Chapter X proceedings stated to the court (a) that the trustee supported and recommended approval of the proposed settlement, and (b) that the SEC had advised him that it would appear at the November 21, 1972, hearing in the Chapter X proceedings on the Joint Application for

---

37. Most of which were substantially in the form attached to the order but some of which were in the form of letters and telegrams.

38. Encompassing the transcripts of pretrial hearings, testimony, documentary exhibits, answers to interrogatories, pleadings, statements of positions, and briefs.

39. In his brief, Cohen referred to certain facts which he had learned and which he assumed had not been considered by counsel for the plaintiffs in the class suits. He was mistaken in his assumption.

Authority to Compromise Controversy and that it would announce that it had no objection to the proposed settlement.

Counsel for Fetman, for Fink, for Sher, for Andersen, for Clark and for Walston had submitted memoranda in support of the settlement; Cohen had submitted a memorandum in opposition; and one or more reply memoranda had been filed. All had been read by the court before the hearing. All counsel who wished to argue orally were heard.[40]

Counsel for plaintiffs who had submitted fee applications were heard and were questioned at length by the court.

*Subsequent Proceedings*

On October 31, 1972, the trustee had filed in the Chapter X proceedings the "Joint Application for Authority to Compromise Controversy". On November 21, 1972, after I had stated on November 17 that I would confirm the settlement, Judge Eubanks confirmed the settlement of the trustee's claims by an order entered in the Chapter X proceedings, after a hearing at which no objection was made to the confirmation of the settlement.

A final judgment, confirming the settlement of the class actions in M.D.L. 55, was signed on November 30, 1972, and entered on December 4, 1972.

*Reasons for Approval and Confirmation of Settlement*

In State of West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079 (2 Cir. 1971), the Court set out the legal standards to be considered in determining whether a settlement should be approved, by quoting Judge Wyatt's statement in the court below, as follows:

"Whether to approve the compromise involves an exercise of discretion. The Court is responsible for the protection of the many class members whose interests are involved but who do not appear in the action. Approval should be given if the settlement offered is fair, reasonable, and adequate. These terms are general and cannot be measured scientifically.

"The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement. This factor is sometimes referred to as the likelihood of success. The Supreme Court directs the judge to reach 'an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated' and to 'form an educated estimate of the complexity, expense, and likely duration of such litigation * * * and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise'. The Supreme Court then emphasizes: 'Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.' The quotations are from Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. [414,] 415, 424–425, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) [[D.C.,] 314 F.Supp. [710,] at 740–741]." 440 F.2d at 1085.

*The Amount of the Settlement.* As we have seen, the settlement provides the following benefits for class members, before fees: (a) $7 million in cash; (b) $500,000 (being one-third of the $1.5 million received by the Trustee in the

---

40. Cohen urged, inter alia, that the court require the defendants who are contributing to the settlement to state and make public the amount each of them is contributing. At the hearing on September 21, 1972, the court was told by counsel and was convinced that secrecy with respect to the amounts the several defend- ants had agreed to contribute was a sine qua non of the settlement. Assuming that such disclosure may ordinarily be required, the court is satisfied that it should not be required in this case, for reasons which should not be set out while individual actions against various defendants are still pending.

settlement [41]) ; (c) the value to members of the classes of the reduction in the amount of the claims of those persons who benefit by Walston's agreement not to attempt to collect some $500,000 of balances due Walston from class members (since the total claims will probably exceed $100 million, this will represent a reduction in claims of about one-half of 1%, and will benefit other class members to that small extent) ; and (d) the release of about $1 million of claims against the debtor estates, which will benefit class members as holders of one-third of Anta stock to the extent of about $350,000.

These items add up to about $8 million, which is a large sum of money. The total settlement has been said without contradiction to be one of the largest ever paid in a securities case. On the other hand, $8 million dollars is less than 8% of the Class G claims filed in the Chapter X proceedings, and therefore of the presumed amount which will be proved by class members herein.

The Class G claimants will also receive (assuming the approval of the re-

organization plan in the Chapter X proceedings is affirmed on appeal) one-third of the stock of Anta, estimated to be worth $10 million, and the Trustee has testified that in his opinion a prompt settlement of the Trustee's claims will benefit Anta in various ways (outlined at the hearing) and should therefore benefit the class members.[42] For example, the loss carryover, estimated at $23 million, which Anta will enjoy for a time, would provide a dowry for the prospective "bride" in a possible early merger, benefiting the class members who, as Class G claimants in the Chapter X proceedings, will receive shares of Anta stock.

*Likelihood of Plaintiffs' Success.* There is little doubt but that plaintiffs would be able to prove a prima facie case against many of the defendants under one or more of their theories. On the other hand, many of the defendants have possible defenses.[43] The probability of plaintiffs recovering the full amount of their claims is doubtful.[44] Moreover,

41. At the hearing, the Trustee refused to commit himself as to whether the $1,500,-000 would be distributed promptly as a dividend on the Anta stock, one-third of which will presumably be held by the same persons who are members of one of the classes for whose benefit the M.D.L. 55 class actions have been brought. In the November 21, 1972, order in the Chapter X proceedings, the court directed that this be done.

42. The prompt receipt (1) of cash by class members who file their claims herein and (2) of stock by those who have filed Class G claims in the Chapter X proceedings is of some value, albeit difficult to estimate.

43. E. g., counsel for Clark notes that in denying the $4 million claim of the State of Ohio in the Chapter X proceedings, Judge Bohanon found that "no misrepresentations were made to the State of Ohio, or others", and that his decision was affirmed on appeal. State of Ohio v. Four Seasons Nursing Centers of America, Inc.,

465 F.2d 25 (10 Cir. 1972). Counsel for Clark argues that the quoted finding "necessarily encompasses a judgment that in providing its financial statements for the six months ended December 31, 1969, to the State of Ohio, America did not misrepresent its financial condition at that period", and that, "because those financial statements were premised on the independence of Equity and showed substantial receivables due to America from Equity, Judge Bohanon's finding also indicates that America did not misrepresent Equity's independence". Even though the decision on appeal may be read more narrowly than counsel for Clark reads it, there is force in the argument that the finders of fact in the M.D.L. 55 cases may not find all necessary facts in favor of plaintiffs on many of their claims.

44. Harry A. Young, Jr., Esq., attorney for Fetman, et al., whom the court designated as liaison counsel for plaintiffs in connection with the settlement, stated his belief that plaintiffs would ultimately prevail on the merits, but candidly sum-

unless plaintiffs can hold the accountants liable, it appears that they cannot collect anywhere near the full amount of their claims.[45] The accountants have several defenses to the various charges, particularly to the only one which can be expeditiously handled, i. e. the claim based upon the single conspiracy theory.[46]

■ *Classes and Subclasses.* Plaintiffs' other theories and claims would almost certainly require a considerable

marized the difficulties facing plaintiffs as follows:

"Certain of the defendants have raised questions which are substantial in nature * * * [including] * * * statutes of limitations, measure of damages, class definitions, and that these consolidated cases are not susceptible to class action treatment * * *. There also would be at a later point in time questions of individual reliance (if reliance still is an issue) and individual damage suffered by the many thousands of class members, the proof of which * * * would be lengthy and difficult.

" * * * the issues of accounting and market manipulation raised in the pleadings present numerous and complex issues and problems. * * *

"All of the foregoing present substantial problems in trying these consolidated cases to a jury. It is very possible that if there were split trials in these consolidated actions, the trial on the issue of liability alone to a jury might take many, many months and subsequent trials or hearings on individual damages before a jury, special master, or a judge might literally consume years in view of the many thousands of potential claimants. There also are questions * * * as to whether any portion of any claimed loss might be attributable to general market conditions during the period preceding the Four Seasons reorganization proceedings, whether any portion of any loss suffered by the claimants is attributable to stocks of nursing homes in general losing favor with the public, and what percentage of any loss was attributable to the wrongful activities of the defendants in light of such other issues. All of the foregoing accounting and damage questions would require the opinion of numerous experts, whose opinions would undoubtedly conflict. * * *"

All of the defenses referred to by Young have been raised by defendants, who argue: that no general conspiracy has been established by the discovery to date, or, in fact, existed; that Equity was not a sham; that the stock of America was one of the "high flyers" on Amex, and that the price of 184 times reported earnings reached in 1969 was produced largely by the speculative fever which pervaded the market at that time, as shown by the fact that several nursing home stocks sold at an even higher price-earnings ratio. Defendants argue that the complex questions of fact and law (including reliance, causation, scienter, limitations, and complicated problems of proof and admissibility of evidence against the numerous defendants, absent the establishment of a conspiracy among them) would make recovery against defendants highly unlikely and result in an unmanageable proceeding. They also argue that even if liability were established, the ascertainment of the appropriate amount of damages recoverable by the possible classes and subclasses from the several defendants would further complicate and delay the ultimate disposition of the claims. See Feit v. Leasco Data Processing Equipment Corp., 332 F.Supp. 544, 586 (E.D.N.Y.1971). Cf. Esplin v. Hirschi, 402 F.2d 94, 104–105 (10 Cir. 1968), and the opinions in Chasins v. Smith Barney & Co., 438 F.2d 1167, 1169, 1174 (2 Cir. 1970–1971).

45. Objectors suggested that additional defendants be added, basing their suggestion on the assumption that they had unearthed additional facts. Substantially all of those facts were already known to counsel for Fetman, Fink, Sher and Ginsberg, who had decided that the suggested defendants should not be added; one was already a party.

46. Counsel for plaintiffs have espoused the theory that a conspiracy was entered into between defendants Clark, Bouse, Gray, some officers of Walston and some partners of Montgomery to raise and keep up the market price of America stock so that they could unload their holdings at a substantial profit. Such a theory makes sense, whether or not it could be proved. But when the conspiracy theory is expanded to include Andersen and other defendants, it becomes less plausible, more difficult to prove, and likely to split into several claimed conspiracies.

number of classes or subclasses. There are involved in this case the securities of America, Equity, FSN and Overseas, some of which were sold in the America private placement, some in the first America public offering, some in the second America public offering, some in the Equity private placement, some in the Equity public offering, and some in the after-markets following all of these offerings.[47] One or more of the possible classes could not be represented by any of the plaintiffs in the five class actions.[48] The issue of limitations is not the same for the several claims, and the availability of that defense in some of the situations presented is not clear. The issue of reliance is still very much up in the air with respect to several of the claims asserted. See Affiliated Ute Citizens of Utah et al. v. United States, et al., 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed. 2d 741 (1972). That issue could hopelessly fragment the proposed class or classes.[49]

*Likely Duration of Litigation.* The shortest realistic estimate of the time within which the cases can be brought to trial is one year, provided the ultimate decision with respect to classes permits one or two trials on one or a few relatively simple theories of liability against individuals, partnerships and corporations. If that is not possible, by reason of the prosecution of various claims on various theories against various defendants or classes of defendants, with attendant rulings in this court and possible appeals, the time within which any of the cases can be brought to trial would probably be at least doubled. In either event there would probably be many cross-

---

47. Andersen argues that there must be separate classes based upon the six audit reports it certified, because a person who bought stock before a later report was made public cannot say that he relied on the later report.

48. Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); Thaxton v. Vaughan, 321 F.2d 474 (4 Cir. 1963). This rule applies to actions arising under the Securities Acts. Greenstein v. Paul, 275 F.Supp. 604 (S.D.N.Y.1967), aff'd 400 F.2d 580 (2 Cir. 1968); Basch v. Talley Industries, Inc., 53 F.R.D. 9 (S.D.N.Y.1971); Sanders v. Merrill Lynch, Pierce, Fenner & Smith, Inc., CCH Fed.Sec.L.Rptr. ¶ 93,226 at 91,-409 (S.D.N.Y.1970); Puharich v. Borders Electronics Co., Inc., CCH Fed.Sec.L. Rptr. ¶ 92,160 at 96,728 (S.D.N.Y.1968); Cordova v. Bache & Co., 321 F.Supp. 600, 604 (S.D.N.Y.1970); Bluestein v. Friedman, CCH Fed.Sec.L.Rptr. ¶ 92,-558 at 98,543–98,544 (S.D.N.Y.1970); DiJulio v. Digicon, 339 F.Supp. 1284, 1292–1293 (D.Md.1972). See generally Rule 23, F.R.Civ.P., and Advisory Committee Note, 39 F.R.D. 69, 99–100 (1966); 3B Moore's Federal Practice ¶ 23.04 (1969).

49. Objectors suggested that the court should create a subclass of persons who purchased stock before it reached its zenith but failed to sell until later because of alleged misstatements or mis-representations by defendants, despite the fact that such persons realized a profit and not a loss on the transactions in question. It is true that those facts would not make such persons a member of either class covered by the settlement agreement; but it would not be proper to create such a class in these cases. See DiJulio v. Digicon, 339 F.Supp. 1284, 1292 (D.Md.1972), where the court quoted the following statement from Marino v. Coburn Corp. of America, CCH Fed.Sec. L.Rptr. ¶ 92,959 (E.D.N.Y.1971) (Dooling, D. J.):

> "Yet if there is such a definable group of non-selling stockholders, it is all but impossible to envisage them as damaged in their investor interest by the fact of non-disclosure as distinguished from being damaged by reason of the fact that—whenever and however disclosed—the company had a heavy loss to shoulder in the immediate future. There is no indication that a press release which told everything that management knew and anticipated would not have at once brought about an adjustment of market price to a level at which existing stockholders would register the maximum loss in market value that could flow from such a disclosure."

Moreover, it is hard to see how such plaintiffs could constitute a manageable class, since the material facts with respect to each of them would be likely to differ.

claims and third-party claims, which would be likely to extend the time even further. In view of the complexity and novelty of some of the points, there would probably be appeals from one or more final judgments, further extending the time when members of the class might expect to collect anything. Because of the nature of the claims against the several defendants and the probability of cross-claims and third-party claims, most defendants would need separate counsel. The cost of defense would be very substantial, and would affect the ability of some defendants to pay whatever judgments might eventually be recovered against them.

*Expense of Continuing Litigation.* None of the plaintiffs in the class suits appears eager to finance the cost of continuing litigation, although at least two of them are well able to do so. None of them has objected to the settlement; all of them wish to accept it.[50] The objectors indicated that they did not wish to finance the further prosecution of the cases.[51] No one volunteered.

*Recommendation by Counsel.* It has been stated that a court should not substitute its judgment for that of the parties who worked out the settlement, in the absence of fraud, collusion or bad faith, or of evidence that the settlement, taken as a whole, is so unfair as to preclude judicial approval. See Newman v. Stein, 464 F.2d 689, 691–692 (2 Cir. 1972); United Founders Life Ins. Co. v. Consumers Nat. Life Ins. Co., 447 F.2d 647 (7 Cir. 1971); Glicken v. Bradford, 35 F.R.D. 144, 151 (S.D.N.Y.1964);

Zerkle v. Cleveland-Cliffs Iron Company, 52 F.R.D. 151, 159 (S.D.N.Y.1971).

In Cannon v. Texas Gulf Sulphur Co., 55 F.R.D. 308, 316 (S.D.N.Y. 1972), Judge Bonsal stated that the court should give great weight to the fact that the lawyers for substantially all the plaintiffs and defendants who had been engaged in that arduous litigation for seven years unanimously supported the settlement. Here, the lawyers for the class plaintiffs have been engaged in this litigation for two and a half years, and all of the lawyers who have been actively engaged in the litigation support the settlement. The court must also consider, however, whether there was any fraud or collusion in arriving at the compromise.

No one suggests that there was any fraud or collusion in the ordinary sense. However, Cohen, for himself and the other objectors, states in his memorandum:

"The Court is also requested to make an inquiry into the extent that the settlement reached was truly the result of adversary proceedings in which the protection of the interests of the Class G claimants was the primary concern of the attorneys representing that class. This statement is not meant to impeach the integrity of those lawyers who represented the class up to now. Rather, it is meant to suggest that, for one reason or another, perhaps, with respect to the settlement, their interests were not identical to those of the class."[52]

---

50. None of them has paid anything toward the expenses incurred during the last two years by their counsel, in amounts of $31,022, $28,361.61 and $16,134 for the three separate groups.

51. They suggested that the Trustee in the Chapter X proceeding should do so. No order in this proceeding could require this action. The objectors did not make the suggestion in the Chapter X proceeding, where the Trustee, the creditors, the SEC and the court were satisfied with the settlement.

52. Cohen's memorandum continued: "Out of a gross cash settlement to the class of $7,000,000 these lawyers have claimed $2,500,000 as fees and expenses. It is true that $7,000,000 is an objectively large sum, but it is a very small sum when compared to the estimated damages of $110,-000,000. In this respect, it is difficult to see how the lawyers could have gotten significantly more money if the class had actually been completely compensated. It is true that the time and expense of further litigation would have raised the

At oral argument, after he had heard from all attorneys for plaintiffs and defendants, Cohen softened his criticism. But whether or not the point is raised by any of the parties, the court should consider it in such a case as this, and has considered it in the light of everything which has been brought to the attention of the court from May 1971 to date and of all the points discussed herein.

The court concludes that the implied charge that counsel for Fetman, Fink and Sher did not act in the best interests of their clients and the classes in negotiating the settlement is not supported by the facts.

*Failure of Other Members of Classes to Object.* Not only the lawyers for the plaintiffs in the five class actions have approved the settlement, but the overwhelming majority of the members of the classes have in effect approved it, because (a) only twelve persons (or couples), having claims amounting to about one-half of 1% have opted out, (b) only seven persons (or couples) having claims of about one-third of 1% have objected, whereas (c) 2,539 proofs of claim totalling over $22 million had been filed herein as of November 9, 1972, only about one month after the notice, with about two months remaining for filing claims.[53]

*Manageability.* The various theories, claims and contentions now advanced by plaintiffs will probably cause fragmentation of the proposed class or classes of plaintiffs for any purpose except discovery, and make these cases very difficult, if not impossible, to manage.

The pleadings and the further discovery which would be required if the settlement were not approved would be likely to increase the problems.[54]

The case has proved to be a Hydra, for when one problem is disposed of, two are likely to arise in its place, and the solution of cauterizing the wounds by settlement becomes desirable from the standpoint of the court system, as well as of all parties, if the proposed settlement is fair.

### Conclusion

■ The proposed settlement is fair, reasonable, equitable, adequate, and in the best interests of the classes.

The plan of distribution, including the administrative provisions thereof, is fair, reasonable, equitable, and in the best interests of the classes.

As noted above, the court has already entered a judgment, signed on November 30, 1972, and entered on December 4,

amount of their expenses, as well as the amount that constituted a 'reasonable fee'. However, the self-interest of the lawyers was certainly better served by an immediate settlement followed by an immediate payment than it would have been by insisting to a higher settlement which might not be agreed to. The latter course would only serve to delay the payment of an amount no bigger than that to which they now apparently feel entitled."

The court has not yet approved any fees for counsel, but will do so in a separate opinion, promptly after considering all evidence submitted and all memoranda, filed and to be filed, on the subject.

53. These figures are even more impressive when it is considered that seventeen investment companies and other corporations, having claims running from $1

million to $14.6 million, a total of over $53 million, about half of the total claims, have neither opted out nor objected to the settlement.

54. The case bristles with potential crossclaims and third-party claims. For example, Clark contends that he relied on the advice of Walston, Andersen and various prestigious law firms not now parties, and Walston, Andersen and other defendants contend that they relied on statements of Clark. If the court should, after further discovery, allow amendments to the complaints which would bring in other broker-dealers, the problems discussed would be compounded, and the number of classes for any purpose except discovery would almost surely become unmanageable.

1972, approving and confirming the proposed settlement and the plan of distribution and overruling the objections thereto.