In re **FOUR SEASONS SECURITIES LAWS LITIGATION Opinion No. 4. M.D.L. Docket No. 55.**

United States District Court,
W. D. Oklahoma.
June 7, 1973.

---

See also, D.C., 59 F.R.D. 657; D.C., 361 F.Supp. 636.

Richard F. Stevens, John R. Ferguson, and Baker, Hostetler & Patterson, Cleveland, Ohio, and William J. Brown, Atty. Gen. of Ohio, and Ronald Boyd Brown, Asst. Atty. Gen. of Ohio, for the State of Ohio.

Thomas W. Kelly, Richard W. Lyon, and Breed, Abbott & Morgan, New York City, for Walston & Co., and others.

Arthur F. Mathews, Robert B. McCaw, and Wilmer, Cutler & Pickering, Washington, D. C., for Jack L. Clark.

William G. Paul, and Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., for Arthur Andersen & Co.

Harry A. Young, Jr., Chicago, Ill., court-appointed, for members of the M.

D.L. 55 classes in matters relating to processing of claims.

## MOTION OF OHIO FOR RELIEF FROM JUDGMENT

THOMSEN, District Judge.[*]

The State of Ohio seeks relief under Rule 60(b), F.R.Civ.P., grounds (1), (4) and (6),[1] from the provision of the judgment herein signed on November 30, 1972, and entered on December 4, 1972, which barred forever the prosecution against the defendants in the class actions or anyone else of any and all settled claims by any member of either or both of the M.D.L. 55 classes, established by the order of September 21, 1972, herein, except by those who filed timely requests to be excluded from the classes. That judgment was entered after a hearing on approval of the settlement of the M.D.L. 55 class actions. See Opinion No. 2 herein, 58 F.R.D. 19, at 32–35 (1972).

Ohio had filed three actions in March 1972 against various persons, firms and corporations (including several persons who were defendants in the M.D.L. class actions) based upon alleged violations of its common law rights, various Ohio statutes, the Federal Securities Act of 1933 and the Federal Securities Exchange Act of 1934, arising out of loans in the total amount of $4,000,000 made by Ohio to Four Seasons Nursing Centers of America, evidenced by promissory notes of that corporation. Ohio was a member of the classes established by the order of this court dated September 21, 1972, because it was the holder of securities, as defined in the Federal Securities Laws, or of commercial paper, or both. See Opinion No. 2, 58 F.R.D. at

---

[*] Of the District of Maryland, sitting by designation.

1. "Rule 60. *Relief From Judgment Or Order*
 " * * *
 "(b) *Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.* On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; * * * (4) the judgment is void; * * * or (6) any other reason justifying relief from the operation of the judgment. * * *"

32. Although Ohio received notice of the settlement of the M.D.L. 55 class actions, it did not opt out.

Ohio's interrelated arguments as to why it should be relieved from the judgment are based upon claimed mistake of fact, inadvertence, surprise and/or excusable neglect, the alleged merit of its claims, the equities, the asserted lack of prejudice to defendants, and Ohio's contention that it was not adequately represented by any of the class plaintiffs.

### Facts

The court adopts as part of this opinion the contents of Opinion No. 2 herein, 58 F.R.D. 19, which contains a history of the Four Seasons companies, of the Chapter X proceedings involving those companies, and of the M.D.L. 55 suits, including a summary of the settlement, the hearing on confirmation of the settlement, and the subsequent proceedings, as well as a full discussion of the reasons for approval and confirmation of the settlement.

### The Ohio Loans

The facts with respect to the loans are set out in State of Ohio v. Four Seasons Nursing Centers of America, 465 F.2d 25, at 26, 27 (10 Cir. 1972), as follows:

"In early 1970, Mr. Jack L. Clark, the president of Four Seasons, received information that a Mr. Ronald R. Howard of Los Angeles, California, was in a position to assist Four Seasons in borrowing needed funds for continued operation and expansion. Howard and Clark conferred in Oklahoma City for the purpose of consummating an agreement for the procurement of funds. It was anticipated that Four Seasons would borrow between $20,000,000 and $24,000,000 from the State of Ohio. Howard contacted Crofters, Inc., a Columbus, Ohio, investment firm. Mr. Harry A. Groban, the executive vice president of Crofters, requested a credit rating on Four Seasons from the National Credit Office, a division of Dun and Bradstreet. An employee of the National Credit Office procured the latest annual report of Four Seasons, as well as other statements and bank information concerning that corporation from Mr. John Mee, a vice president of and attorney for Four Seasons. Based on this material, the National Credit Office gave Four Seasons a rating of 'prime' for commercial paper. This information was communicated by letter to Groban; Groban in turn furnished the information to Mr. Robert F. Gardner, Deputy Treasurer of the State of Ohio.

"Groban advised Mee that funds would be available to Four Seasons from the State of Ohio. Thereafter, Mr. Alex Russell, an officer of Four Seasons, went to Columbus, Ohio, to secure the funds. On March 9, 1970, Russell consummated a loan of $3,000,000 for Four Seasons with the State of Ohio through Gardner and in the presence of Groban. The loan was evidenced by two promissory notes of Four Seasons, one for $2,000,000 payable in 120 days and another for $1,000,000 due in two years. The $2,000,000 note was made on the basis of 120 days with the understanding that when due the note would be renewed for a period of two years. A second loan for $1,000,000 was advanced on March 23, 1970; a note for $1,000,000 payable in two years to the State of Ohio was executed on that date."

### Chapter X Proceedings

Ohio sought reclamation of these funds as against the Trustee in the Chapter X reorganization proceedings of the Four Seasons companies. Ohio argued, inter alia, that Four Seasons had intentionally made material and fraudulent misrepresentations concerning its financial condition to National Credit Office (NCO) to obtain a rating of prime, and that the loans of

$4,000,000 had been made by Ohio in reliance on that rating. Ohio also argued that the loans were in violation of an Ohio statute and therefore void.

Judge Bohanon denied the reclamation petition. He said, inter alia:

"There is no intimation in this record that Four Seasons defrauded the State of Ohio or made any misrepresentations to the State of Ohio, but at all times dealt above board and submitted all information requested and withheld nothing. Mr. Gardner made no reliance upon any alleged fraudulent document or statement made by the debtor corporation, its officers or agents, and no fraud here exists, and no misrepresentations were made to the State of Ohio, or others." In re Four Seasons Nursing Centers of America, Inc., 329 F.Supp. 647, 651–652 (W.D.Okla., 1971).

On appeal, in addition to points based on Ohio law, which Judge Bohanon and the Tenth Circuit found inapplicable, Ohio argued "that the prime rating relied on by the Ohio Treasurer was obtained through Four Seasons'· materially false statements" and that Ohio was "alternatively entitled to the return of all funds traceable under traditional tracing rules". The Tenth Circuit stated: "We view the narrow issue presented in this appeal to be whether the State of Ohio may properly argue the application of a constructive trust to the funds in question." 465 F.2d at 27.

After deciding that Oklahoma law controlled that issue, the Court said:

"We likewise reject appellant's argument that the prime rating relied upon by the Ohio State Treasurer in making these loans was obtained through Four Seasons' materially false statements concerning its finan-

cial status. The trial court found no fraud or misrepresentation after an evaluation of the testimony presented before it in a full hearing. We hold this decision to be adequately supported by the record; there is no cogent reason to reverse the trial court on this point. Accordingly, we affirm the finding of no fraud or misrepresentation in obtaining the rating of prime from the National Credit Office.

"We are unconvinced by appellant's remaining arguments that a constructive trust is applicable to the funds in question. The quantum of evidence required by Oklahoma for imposition of a constructive trust is substantial. Mere preponderance of the evidence is not sufficient to establish a constructive trust. Rather, it must be established by evidence which is clear, definite, unequivocal and satisfactory. The evidence must lead to but one conclusion, or leave no reasonable doubt as to the existence of the constructive trust. The evidence presented by appellant in the trial court does not rise to the quantum required by Oklahoma." 465 F.2d at 28.

The Tenth Circuit likewise found that there was no illegality surrounding the procurement of the funds, because the evidence did not prove noncompliance with the applicable Ohio statute; it affirmed the denial of relief. 465 F.2d at 28, 29.

Ohio also opposed those portions of the successive plans of reorganization of the Four Seasons companies which resulted in one-third of the stock of the reorganized corporation (Anta) going to "Class G Creditor Stockholders".[2] Ohio and the other general creditors of Four Seasons were "Class C Creditors."[3] At

---

2. See discussion in Opinion No. 2 herein, 58 F.R.D. at 26, et seq.

3. At one time during the reorganization period, the definition of the proposed classes was such that Ohio might have

been included in both Class C and Class G, but the plan as finally adopted allowed Ohio to recover only in Class C. While in Oklahoma City for the November 1971 hearing in the Chapter X proceedings, the attorneys for Ohio discussed the possi-

the hearing on November 2, 1971, on the plan of reorganization as then proposed, Judge Bohanon said:

"The Court now has before it the problem first of whether or not Equity and Four Seasons were in effect one and the same. They worked together, as a joint adventure, helping one another, and helping Jack Clark and his robbers, and that is what they were—nothing short of just rob the American people."

His final oral opinion did not include this remark.

Ohio filed three appeals from orders in the Chapter X proceedings, including the order of July 17, 1972, which approved the Second Amended Plan of Reorganization (Restated). On September 22, 1972, however, Ohio entered into a settlement agreement with the Trustee in the Chapter X proceedings under which Ohio received proceeds from the sale of valuable real estate in addition to the Anta stock Ohio received as a Class C creditor in the Chapter X proceedings, and Ohio agreed to dismiss its pending appeals. A joint application to compromise controversy was filed on September 26, 1972, and approved October 12, 1972.

Another appeal from the order of July 17, 1972, by Charles O. Finley, et al., dealing with a limited aspect of the proceedings, was heard by the Tenth Circuit, which affirmed the district court, 472 F.2d 747 (1973). With respect to Class G stockholders, the Tenth Circuit said:

"The trial court's decision at bar, the effect of which was to give to the Class G group the standing of claimant-creditors, was made only after a very careful consideration of the underlying evidence. The court determined that there was merit in their contentions that they had been de-

bility of Ohio being in Class G with the attorneys for M.D.L. 55 plaintiffs who were pressing in the Chapter X proceedings the claims of persons who became

frauded in the purchase of their shares so that there was a reasonable likelihood that they would have succeeded in litigation. All of this was a basis for the court's approval of the compromise settlement which resulted in their being issued shares in the reorganized company. It cannot, of course, be said that the Class G individuals did not satisfy the definition of 'creditor' and of 'claim' under §§ 106(1) and 106(4). The definition of a 'claim' under the former provision includes all claims whether secured or unsecured, liquidated or unliquidated, fixed or contingent." 472 F.2d at 749.

### The Suits Filed in Ohio

Meanwhile, in March 1972 the State of Ohio, through the office of the Attorney General, filed three suits:

(1) State of Ohio v. Crofters, Inc., et al., Civil Action No. 72–81, in the United States District Court for the Southern District of Ohio, Western Division. Among the several groups of defendants in that case were Clark, Gray, Mee, Andrews and McCollum, defendants in some of the M.D.L. 55 cases. The complaint includes eleven claims:

First Claim—§ 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

Second Claim—§ 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5; § 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b).

Third Claim—§ 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

Fourth Claim—§ 17(b) of the Securities Act, 15 U.S.C. § 77q(b).

Fifth Claim—§ 17(a) of the Securities Act, 15 U.S.C. § 77q(a); § 10(b) of the Exchange Act, 15 U.S.C.

Class G creditor stockholders in the reorganization plan which was finally approved.

§ 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5.

Sixth Claim—§ 15(c)(1) of the Exchange Act, 15 U.S.C. § 78o(c)(1), Rule 15c1–2, 17 C.F.R. § 240.15c1–2; § 15(c)(2) of the Exchange Act, 15 U.S.C. § 78o(c)(2).

Seventh Claim—§ 1707.44(B)(4), § 1707.43, Ohio Revised Code.

Eighth Claim—§ 1707.44(G), § 1707.-43, Ohio Revised Code.

Ninth Claim—§ 1707.14, § 1707.44 (A), and § 1707.43, Ohio Revised Code.

Tenth Claim—§ 1707.41, Ohio Revised Code.

Eleventh Claim—Common Law Fraud.

Some of these statutory bases are the same as those in one or more of the M.D.L. 55 class actions; some are not.

Clark filed a counterclaim against Ohio in this case, third-party claims against Walston & Co. and Arthur Andersen & Co., and various cross claims.

(2) State of Ohio v. Herbert, et al., in the Court of Common Pleas of Franklin County, Ohio.

This is an action against the Treasurer of the State, another official, and the sureties on their bonds, alleging violation of certain Ohio statutes and of the officials' duties. All of the defendants in State of Ohio v. Crofters, Inc., et al., have been brought into that case as third-party defendants.

(3) Shaul, Director of Commerce of the State of Ohio v. Crofters, Inc., et al., in the Court of Common Pleas of Franklin County, Ohio. Clark, Gray, Mee, Andrews and McCollum are also defendants in that case, which is based on alleged violations of the Ohio Code, and seeks injunctive relief.

The S.E.C. filed an action in the Southern District of Ohio to obtain an injunction against Crofters, Inc., and various individuals and organizations, including Clark, based upon various sales of securities in the form of corporate promissory notes, alleging violations of the Federal Securities Laws. See opinion of Judge Rubin in S.E.C. v. Crofters, Inc., 351 F.Supp. 236 (1972), granting injunctive relief.

*Settlement*

During the spring and summer of 1972, negotiations were in progress looking toward settlement of various claims, including those in the M.D.L. 55 actions, the action of the Trustee of the debtor estates against many of the M.D.L. 55 defendants[4] and the appeals of Ohio in the Chapter X proceedings.

Various attorneys for the State of Ohio, including the Attorney General, participated in one or more of these discussions, which were held in Oklahoma City, New York and Ohio. Those attorneys knew about the M.D.L. 55 cases, but no one had yet made an effort to have the case of State of Ohio v. Crofters, Inc., et al., in the Southern District of Ohio, transferred under 28 U.S.C. § 1407. A motion to transfer that case is now pending before the Judicial Panel on Multidistrict Litigation.

The problems involved in determining what class or classes should be established in M.D.L. 55 were the subject of repeated hearings in this proceeding. In July 1972, after prolonged hearings of the class problem, the court stated that it was willing to enter an order, hammered out by court and counsel during the conference, which would, in effect, designate five actions as class actions and conditionally, preliminarily and tentatively divide the persons for whose benefit the cases purport to be brought, solely for pretrial and discovery purposes, into two classes, subject to the right of the court to modify or withdraw such designation and division at any time prior to decision on the merits. Relevant portions of the proposed order

4. Which replaced the derivative claims theretofore made in some of the M.D.L. 55 cases.

are set out in Opinion No. 2 herein, 58 F.R.D. at 31, including notes 28 and 29. As this court noted in that opinion: "All counsel present then advised the court that they were engaged in very serious settlement negotiations, and asked the court to hold up the entry of the proposed order for a brief period, to permit them to continue their negotiations. They convinced the court that, in view of all the circumstances of this case, it would be fairer to the thousands of members of the potential classes, as well as the parties presently represented by counsel in the cases before the court, to let them know the terms of a proposed settlement before requiring them to decide whether or not to opt out." 58 F.R.D. at 31. See also note 30 on that page. The negotiations looking toward a settlement of the M.D.L. 55 claims and the claims of the Trustee against many of the same defendants continued until a settlement was reached and presented to this court on September 21, 1972.

During the last two months of those negotiations it became apparent that a settlement of the Ohio claims in the Chapter X proceedings was a prerequisite to a settlement of the M.D.L. 55 and Trustee claims, because, until the Ohio claims in the Chapter X proceedings were settled, the Second Amended Plan of Reorganization (Restated) could not be carried out. Negotiations continued between the attorneys for Ohio and the attorneys for the Trustee, at least one of which was held in New York at the same time as a meeting of the attorneys for both sides in the M.D.L. 55 cases. While in New York the attorneys for Ohio met with some of the attorneys for the defendants in M.D.L. 55, but did not meet with the attorneys for the plaintiffs therein. The attorneys for the M.D.L. 55 defendants knew that Ohio was unwilling to settle its claims against "the Four Seasons insiders" (Clark et al.) unless Ohio received something more than had been offered to it by the Chapter X Trustee.

The attorneys for Ohio were never told that Ohio was a member of one of the classes which this court had indicated would be designated conditionally and tentatively for pretrial and discovery purposes in M.D.L. 55 if the settlement negotiations fell through. No attorney for Ohio asked about the classes in M.D.L. 55 and no other attorney volunteered the information, evidently believing that the attorneys for Ohio were aware of the situation.

The attorneys for Ohio and for the Chapter X Trustee agreed upon the terms of their settlement on September 13, 1972; Gretick, the attorney who was in active charge of the case for Ohio, went to Oklahoma City on September 19 to work out the terms of the joint application. Bailey, the attorney for the Trustee, left for Baltimore on September 20, and was present when the terms of the settlement of the M.D.L. 55 class claims and the Trustee's claims against Clark et al. were finally agreed upon and when the September 21 order of this court was signed. See 58 F.R.D. at 32 et seq. In that order the classes were defined as follows:

"(a) All persons (other than the Four Seasons companies, the Trustee thereof, the reorganized company, its subsidiaries and affiliates, defendants named in any of these class actions, and the partners of any of said defendant partnerships) who at any time from May 9, 1968 to July 22, 1970, both inclusive, purchased or acquired securities or commercial paper issued by America, Franchise or Overseas, and who suffered a loss thereon or after July 22, 1970 still owned any such securities or commercial paper;

"(b) All persons (other than the Four Seasons companies, the Trustee thereof, the reorganized company, its subsidiaries and affiliates, defendants named in any of these class actions, and the partners of any of said defendant partnerships) who at any time from November 6, 1968 to July 22,

1970, both inclusive, purchased or acquired securities or commercial paper issued by Equity or FSN, and who suffered a loss thereon or after July 22, 1970 still owned any such securities or commercial paper."

Bailey returned to Oklahoma City that evening and on September 22 he and Gretick completed work on the joint application for approval of the Ohio claims in the Chapter X proceedings. Bailey told Gretick that the M.D.L. 55 order had been signed, and that "the case had been settled around Ohio".

The court finds that Bailey and all the M.D.L. 55 lawyers on both sides assumed that Ohio would opt out when it received the notice called for by the order of September 21. That was the reason the attorneys who prepared the settlement papers included therein the reservation of the rights of the M.D.L. 55 defendants to assert their claims and causes of action, including cross claims and claims for contribution and indemnity, which relate to or arise out of or in connection with the Ohio $4,000,000 loan and the litigation relating thereto. See n. 12, below.

The notice and the copy of the order which accompanied the notice made it quite clear that the settlement of the class actions was intended by all parties thereto to cover all claims which had been or could be asserted by or on behalf of the classes as defined in the order, arising out of or relating to any act or omission relating to the Four Seasons companies, or relating to the business, management or financial statements of any of the Four Seasons companies, or transactions in the securities or commercial paper of any of the Four Seasons companies.

The notice of the proposed settlement provided for in this court's order of September 21, 1972, was duly published in The Wall Street Journal, as required by the order. Moreover, two copies of the order, notice and accompanying papers were mailed to Ohio, one addressed to State of Ohio, c/o Attorney General, and the other to William Brown, Attorney General. The return receipts indicate that both mailings were delivered to the office of the Attorney General, one on October 6 and one on October 10, 1972. One set found its way into Gretick's file; the other has not been accounted for.

Gretick was in Oklahoma City on October 12, 1972, in connection with the hearing on the settlement of Ohio's claims in the Chapter X proceedings. He had not read the M.D.L. 55 order of September 21 or the notice. Bailey showed him a copy of the order; Gretick "riffled" through it without reading it carefully, and asked Bailey to mail him a copy. That was not done. The most reasonable inference is that somewhere in the chain of command an underling knew that two copies of the order had already been sent to the Attorney General of Ohio and assumed that a further mailing was unnecessary.

Because of the death of his father, Gretick left the Attorney General's office two weeks later to return to his old law firm, and was busy in the meantime transferring his cases to other assistants. Ronald B. Brown was made lead counsel in the Four Seasons cases. Late in October he looked at the many papers in the files, saw the M.D.L. 55 order of September 21, read the first page and thumbed through some additional pages, but assumed that Gretick had done what was necessary, in view of the date of the order.

No election to opt out was filed by Ohio.

The failure of Ohio to opt out was not discussed at the hearing on approval of the settlement held in Oklahoma City on November 16, 17, 1972.[5]

---

5. The only mention of Ohio at that hearing was when the attorney for Clark, dis-

cussing the defendants' chance of success if the cases went to trial, referred to the

In the judgment which was signed on November 30 and entered on December 4, 1972, the court, inter alia, (1) found that "the Trustee timely served by registered mail a copy of the Order and its exhibits, including the notice annexed thereto, upon all named plaintiffs in * * * State of Ohio v. Crofters, Inc. et al., * * * Shaul v. Crofters, Inc. et al. * * * and upon third party plaintiffs in * * * State of Ohio v. John D. Herbert, et al.", and (2) stated that "[a]ll of the findings and determinations made in the Order, whether conditional, *prima facie* or absolute, are confirmed and made absolute, unconditional and final", and Ordered, Adjudged and Decreed:

"A. The proposed settlement is hereby finally approved and confirmed as being fair, reasonable, equitable and adequate, and the parties thereto are directed to perform all acts required by the proposed settlement in accordance with the terms of the Order and this final judgment.

"B. The Plan of Distribution, including the administrative provisions thereof, is hereby approved and confirmed as being fair, reasonable, equitable and adequate.

"\* \* \*

"I. Each and all of the class actions (Civil Actions Nos. 70–375, 71–349, 71–354, 71–582 and 71–353) and all settled claims are dismissed without costs, with prejudice and on the merits, as to all members of the classes, and each member of either or both of the classes is forever barred from the prosecution against the defendants in the class actions or anyone else of any and all settled claims.

"\* \* \*

"L. Each member of the classes who claims a right to participate in the Class Settlement Fund shall be required to execute and deliver, as a part of his proof of claim, a good and sufficient release in the form contained in Exhibits D–1 and D–2 to the Order, and no proof of claim shall be allowed without a release in such form.

"\* \* \* \*"

Provisions similar to Paragraphs I and L, quoted above, had been included in the order of September 21, referred to in the notice, because all the attorneys who negotiated the settlement and the attorneys who appeared at the confirmation hearing on November 16, recognized that the cases could not be settled unless the M.D.L. 55 defendants were protected against having to defend the cross claims or third-party claims which would likely be made against them or some of them in any suits brought by purchasers of Four Seasons securities against persons other than M. D.L. 55 defendants. The mere fact that a plaintiff has sued or may sue a broker or a registered representative alone or jointly with M.D.L. 55 defendants in connection with the purchase of Four Seasons securities does not remove the claims of such a plaintiff from the claims covered by the settlement. Something more must be shown, unless the plaintiff opted out. Otherwise, defendants might be called upon to defend hundreds or even thousands of actions, and the purposes of Rule 23 would be thwarted. The settlement provided that any defendant might withdraw from and terminate the settlement if requests for exclusions from the classes were timely filed [6] by potential members having aggregate claims of $4,000,000 or more.[7]

---

fact that in the hearing on Ohio's reclamation petition "the Federal District Court found that the State of Ohio, who falls within the classes here represented by the plaintiffs, had not proven that they had been defrauded, and that was affirmed by the Tenth Circuit." See also note 43 to Opinion No. 2, 58 F.R.D. at 37.

6. I. e., by November 1, 1972, the last day for filing such requests fixed by the order of September 21.

7. Calculated in accordance with the terms of the settlement agreement.

Such right of withdrawal by a defendant had to be exercised by November 9, 1972, with certain rights of extension to December 8, 1972.

On or about December 5, 1972, after counsel for Clark had referred to the settlement during a pretrial hearing before Judge Rubin in State of Ohio v. Crofters, Inc., et al., Brown read the M.D.L. 55 order of September 21. After consultation with the Attorney General, Ohio's present independent counsel were consulted as to Ohio's involvement in M.D.L. 55. Ohio took no appeal from the judgment but, on December 21, 1972, filed its Motion to Obtain Relief from Final Judgment, and after conferences with counsel speaking for the principal defendants herein, the procedures to be followed were agreed upon and this court entered an order, set out in note 8 in the margin.

### Discussion

*The Interrelation of Rule 60(b) and Rule 23*

In this case Rule 60(b) and Rule 23 must be read and considered together. Rule 60(b), the relevant portions of which are set out in n. 1, above, is broadly worded to permit the court to avoid injustice.

Rule 23 is designed to avoid a multiplicity of lawsuits while protecting the substantive rights of plaintiffs and defendants. The notice provisions of Rule 23 (as amended effective July 1, 1966) are designed to provide due process and, at the same time, achieve finality in class litigation.[9]

A claim of mistake, inadvertence, surprise or excusable neglect, a claim that the judgment is void, and any other reason alleged to justify relief under Rule 60 from the operation of the judgment, must be considered in the light of the purposes and provisions of Rule 23.

A too liberal application of Rule 60(b) in class actions would undermine the finality of judgments entered therein and would discourage settlement of such actions. Defendants will be loath to offer substantial sums of money in compromise settlement of class actions unless they can rely on the notice provisions of Rule 23 to bind class members. Courts favor the settlement of controversies; fair compromise settlements are particularly important in com-

---

8. "Upon the motion of the State of Ohio for permission to file a conditional proof of claim, and upon assurance by Special Counsel to the Attorney General of Ohio that Ohio will not file an appeal from the judgment entered herein on December 4, 1972,

"It is Ordered this 29th day of December, 1972, that the State of Ohio be authorized to file a contingent proof of claim in the form authorized by this Court's order of September 21, 1972; that such proof of claim shall be null and void and of no effect if Ohio's motion for relief pursuant to Rule 60(b) is finally granted; and that such proof of claim shall become fully effective and unqualified if Ohio's motion pursuant to Rule 60(b) is finally denied. A copy of this order shall be attached to and become a part of the proof of claim to be filed by Ohio pursuant hereto."

9. Rule 23(c)(2) provides:

"(2) In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel."

Rule 23(e) provides:

"(e) *Dismissal or Compromise.* A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

plex, multi-party litigation which is likely to require many months of court time over a period of years.

### 60(b)(1)—Mistake, Inadvertence or Surprise

■ In this case two individual notices were delivered to and received by the office of the Attorney General of Ohio, one on October 6 and one on October 10, 1972.[10] No action pursuant to the notice and order was taken by any one on behalf of Ohio until after December 8, 1972. If the order was not read, one or more of Ohio's attorneys were negligent; if it was read, and not acted upon, they were equally negligent.

There was no mistake on the part of Ohio which would warrant relief on that ground in this case under Rule 60(b). Nor was there any surprise or inadvertence, as those terms are used in that Rule.

If mere failure to read a notice sent under Rule 23 were held to constitute either mistake, inadvertence or surprise sufficient to obtain relief under Rule 60(b), few judgments in large class actions would be free from successful attack, and settlement of such cases would be seriously discouraged.[11]

Ohio must prevail in this case, if at all, on one or more of its other claims.

### 60(b)(1)—Excusable Neglect

■ The attorneys for Ohio were negligent in not reading the notice and order which was sent to them. The question is, whether such neglect was excusable under all the circumstances.

The fact that Ohio had one or more independent suits pending against some of the M.D.L. 55 defendants does not entitle Ohio to relief from the judgment. Nor does the breakdown of internal procedures in the office of the Attorney General. This court agrees with and adopts the reasoning of Judge Metzner in Supermarkets General Corp. v. Grinnell Corp., (S.D.N.Y.1973), reported in 59 F.R.D. 512.

If Ohio's attorneys had read the notice and order, Ohio would have opted out. The attorneys for plaintiffs and the attorneys for defendants who negotiated the settlement expected Ohio to opt out. The provision in the order of September 21 preserving defendants' claims against Ohio [12] was included with the assumption that Ohio would opt out; indeed, Clark has stated that he will dismiss his claims against Ohio if Ohio's attack on the judgment herein fails.

These facts, alone, would not justify a decision in Ohio's favor on its motion. But they help support a finding, which this court makes upon all the evidence, that although Ohio's attorneys knew of

---

10. Notice was also duly published in The Wall Street Journal, in accordance with the order of September 21.

11. The court does not imply that published notice may not be sufficient in appropriate cases. Under the facts of this case, both Rule 23 and the order required that individual notice be sent to the State of Ohio.

12. That provision of the order was as follows:
"19. The consenting defendants expressly reserve all rights, claims and causes of action, including cross-claims and claims for contribution and indemnity, if any, which they may have against any persons whomsoever, including any other consenting defendants (other than the debtor estates in the reorganization proceedings, the Trustee, their attorneys, past or present, and the resulting reorganized company and its subsidiaries and affiliates) which relate to, or arise out of or in connection with, the State of Ohio's loan of $4,000,000 to America, any act or omission with respect to such loan, the litigation relating thereto, and claims, cross-claims and third-party claims asserted in State of Ohio v. Crofters, Incorporated, et al., Civ.–72–81 (United States District Court for the Southern District of Ohio), Shaul v. Crofters, Incorporated, et al., 72–CV–03–791 (Franklin County, Ohio, Court of Common Pleas), and State of Ohio v. John D. Herbert, et al., 72–CV–03–792 (Franklin County, Ohio, Court of Common Pleas). * * *"

the M.D.L. 55 class actions, they conducted their negotiations with the attorney for the Trustee, participated to some extent in the September 7 meeting with attorneys for the M.D.L. 55 defendants and prosecuted their suits in Ohio against various defendants, including some of the M.D.L. 55 defendants, in the belief that Ohio would not be included in the M.D.L. 55 classes. The attorneys for the M.D.L. 55 defendants and the attorney for the Chapter X Trustee did nothing to dispel this belief of Ohio's attorneys. This court does not criticize the attorneys for the M.D.L. defendants or for the Trustee, and does not find that they made any misrepresentation or deliberately misled Ohio's attorneys. But the course of the dealings during the period from July 20, 1972 (when this court indicated the classes which it would establish for discovery and pretrial purposes if the cases were not settled),[13] through September 22, 1972 (when the joint application for the settlement of Ohio's claim in the Chapter X proceedings was completed), lulled Ohio's attorneys into the belief that the statement made to them "that the case had been settled around Ohio" meant that Ohio was not involved in the M.D.L. 55 settlement. On October 12, 1972, Gretick, the Ohio attorney in charge of the case, saw the M.D.L. 55 order of September 21 in Bailey's office, "riffled" through it and asked Bailey to send him a copy, which was not sent. But the evidence does not show that Gretick read enough to learn that Ohio was intended to be included in the M.D.L. 55 settlement, or that Bailey told Gretick that Ohio was included.[14]

The facts just recited *explain*, although they do not *excuse*, the neglect of Gretick and Brown to read the notice and order or the neglect of the attorneys for Ohio to cause Ohio to opt out.

### 60(b)(4)—Ohio's Contention That the Judgment was Void As To Ohio

Apart from any constitutional requirement of due process, Rule 23 requires that in all class actions:

(a) (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class";

(a) (4) "the representative parties will fairly and adequately protect the interests of the class"; and

(c) (2) in any class action maintained under (b)(3), which includes the M.D.L. 55 class actions, "the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel."

Subsection (e) provides: "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

If these requirements are met, the requirements of the Due Process Clause are satisfied.

### Notice

The evidence shows and the court finds that the required notice was given.[15] The evidence further shows

---

13. See Opinion No. 2, 58 F.R.D. at 30, 31.

14. Again, the court implies no criticism of Bailey.

15. The notice called for by 23(c)(2) and the notice called for by 23(e) were combined in one notice, for reasons explained in Opinion No. 2, 58 F.R.D. at 31. The court determined after the hear-

that two copies of the notice were actually received by Ohio.

■ But where a party has not appeared, although he has received due notice, the judgment will not be binding upon him unless he has had representation which meets the tests of Rule 23(a)(3) and (4), quoted above. Adequacy of representation cannot take the place of notice; nor can notice take the place of adequacy of representation.

### Adequacy of Representation

In the order of September 21, 1972, the court found and determined, for the purpose of effectuating the proposed settlement and subject to the effectuation thereof, that with respect to each of the two classes established by that order the requirements of Rule 23(a)(3) and (4), quoted above, were met, as well as the other applicable requirements of Rule 23. Following the hearing on November 16, at which an attack was made on the adequacy of representation in connection with the settlement, this court, for the reasons stated in Opinion No. 2 herein, 58 F.R.D. at 40, 41, entered a judgment on December 4, 1972, which confirmed those findings.

The evidence offered by Ohio and the M.D.L. 55 defendants in support of and in opposition to Ohio's pending motion, together with the record of the proceedings in M.D.L. 55, summarized in Opinion No. 2, 58 F.R.D. 27 et seq., show that the findings were justified with respect to almost all claims of purchasers of Four Seasons securities.

Whether they were justified with respect to the claims asserted by Ohio requires a consideration of two points raised by its attorneys: (1) that several features distinguish Ohio's claims from the claims of all other class members, and (2) that the class representatives could not and did not fairly and adequately protect the interests of Ohio. Those contentions must be considered separately and together, along with all the facts bearing on Ohio's position.

### Rule 23(a)(3)—Distinctive Features of Ohio's Claims—The Typicality Point

Ohio was a member of one of the classes described in paragraph 5(a) of the order, quoted above, because the promissory notes of Four Seasons Nursing Centers of America which it acquired were securities within the meaning of the Federal Securities Act of 1933 and the Securities Exchange Act of 1934. Ohio does not deny that the notes were securities within the meaning of those statutes; indeed most of its claims in State of Ohio v. Crofters, Inc., et al., in the Southern District of Ohio, are based upon its allegation that the notes were securities within the meaning of those statutes.

Most if not all of the claims asserted by Ohio in State of Ohio v. Crofters, Inc., et al., in which Clark, Gray, Mee, Andrews and McCollum were among the defendants, are essentially similar to the claims of the M.D.L. 55 class representatives. The fact that some of the claims were asserted under the securities laws of the State of Ohio or the common law, rather than under the federal statutes, is not sufficient to distinguish those claims from the class claims in M.D.L. 55.[16]

The claims asserted by Ohio in its state court suit against Herbert, the State Treasurer, Gardner, an employee in the office of the Treasurer, and the sureties on their bonds, are not essentially similar to the claims of the M.D.L.

---

ing on November 16, 1972, that adequate notice had been given, and adheres to that determination.

16. The allegations of plaintiff in the case of Shaul v. Crofters, Inc., et al., in an Ohio state court, are generally similar to the claims in State of Ohio v. Crofters, Inc., et al., but the relief sought is injunctive. In S.E.C. v. Crofters, Inc., et al., the relief sought was also injunctive. See opinion of Judge Rubin therein, 351 F.Supp. 236 (S.D.Ohio 1972).

class representatives.[17] On the other hand, the third-party claims asserted against Clark, et al., by the defendants in that case are essentially similar to the claims of the M.D.L. 55 class representatives.

Ohio relies upon several features of its claims to support its contention that the requirements of Rule 23(a)(3) have not been met.

Before discussing those features, it should be noted that Rule 23(a)(3) requires that the claims of the representative parties be "typical" of the claims of the class, not that they be "co-extensive with" or "identical to" those of other class members. See Wright & Miller: Federal Practice and Procedure, Civil: § 1764; 3B Moore's Federal Practice ¶ 23.06–2.

Ohio seeks to distinguish its claims on several grounds. It argues:

(1) That it made three loans to Four Seasons in March 1970 which were evidenced by promissory notes bearing interest at 9½% per annum and maturing essentially in two years; (a) that Ohio bargained for interest return alone and not for any present or prospective equity position in Four Seasons; (b) that Ohio's sole concern was in short-term liquidity, not long-range growth; and (c) that accrued interest upon Ohio's loans amounted to $1,068,672.92 on January 2, 1973.

(2) That its loans were privately negotiated through a finder-broker; (a) that the loans required no registration statement, prospectus, other reporting, or professional underwriting group; (b) that the Ohio statute purportedly authorizing the loans required that the "commercial paper notes" be "rated prime by" NCO, a division of Dun & Bradstreet, before Ohio could invest therein; (c) that the requisite approval of NCO was obtained by the finder-bro-

ker with the cooperation of Four Seasons and exhibited to Ohio; and (d) that Ohio relied not only on Four Seasons' financial statements dated June 30, 1969, and December 31, 1969, but also on the prime rating given by NCO.

(3) That the promissory notes given to Ohio by Four Seasons were represented to be commercial paper.

■ As we have seen, the requirement of Rule 23(a)(3) is that the claim of the representative parties be "typical" of the claims of the class, and that Rule 23(a)(3) does not require that the claims of the class representatives be "co-extensive with" or "identical to" those of other class members. The requirement of typicality may be satisfied even though varying fact patterns support the claims or defenses of individual class members or there is a disparity in the damages claimed by the representative parties and the other members of the class. Wright & Miller, op. cit., § 1764, p. 613.

Each member purchased his security or securities in a separate transaction from those of the other class members, and the fact patterns necessarily varied. See discussion of "Classes and Subclasses" in Opinion No. 2 herein, 58 F.R.D. at 38 et seq. The members of the classes bought their securities through various brokers and registered representatives of Walston and others, during one of the public offerings or in the aftermarket, or in one of the private placements. All relied on alleged misrepresentations embraced in the general conspiracy theory advanced by class representatives and covered by the alleged violations of the securities laws. All of the asserted claims gave rise to potential cross-claims and third-party claims and other problems which made class action treatment and settlement of the cases desirable from the point of view of the

17. See discussion of the loans to Four Seasons made by Ohio contained in the opinion of Judge Rubin in S.E.C. v. Crof-

ters, Inc., Clark et al., 351 F.Supp. at 249 et seq.

plaintiffs, the potential plaintiffs (members of the classes), the defendants and the public.

After considering all of the evidence and arguments, the court concludes that the claims of the class members were typical of the claims of Ohio asserted in State of Ohio v. Crofters, Inc., et al., and in the third-party complaints against Clark and others in State of Ohio v. Herbert et al., but were not typical of the claims asserted by Ohio in its complaint against Herbert, Gardner and their sureties.

### Rule 23(a)(4)—Adequacy of Protection by Class Representatives

In support of its contention under Rule 23(a)(4) that the class representatives and their counsel did not fairly and adequately protect its claims, Ohio advances the same distinctions between its claims and the claims of the class representatives which it advanced in support of its argument under (a)(3).

Those distinctions do not, standing alone, show a lack of adequate representation and protection—again, with the exception of the claims against Herbert, Gardner and their sureties.[18] But the distinctions referred to must be considered in connection with the terms of the settlement embodied in the order of September 21 and the subsequent judgment, and the events which preceded and followed the order of September 21.

The terms of the settlement which have the most important bearing on the issue under consideration are: (1) the provision that claims of class members who had been Class C Creditors in the Chapter X proceedings should be re-duced to 10% of the face amount of the securities on which their claim is based; and (2) the provision which reserved the rights of the M.D.L. 55 defendants against Ohio. See n. 12, above.

(1) After hearing all of the evidence and arguments on the Ohio motion, the court adheres to the finding and conclusion that the Plan of Distribution, including the 90% reduction in the claims of those who had been Class C Creditors was fair and reasonable under all the circumstances. It was not objected to by any of the persons whose claims were so reduced, and a large percentage of the class members who had been Class C Creditors in the Chapter X proceedings have filed claims and releases herein pursuant to the settlement. It is true, however, that none of the class representatives had been a Class C Creditor in the Chapter X proceedings, and there is some force in Ohio's argument that the class representatives and their attorneys could not adequately represent it in the settlement.[19] It is not necessary, however, to decide this point alone, because it must be considered along with the other provisions in the order dealing with the Ohio cases set out in n. 12, above, and the negotiations and conversations of the attorneys for Ohio with the attorneys for the Trustee in the Chapter X proceedings and with the attorneys for some or all of the defendants in M.D.L. 55.

The court does not suggest that the Trustee and his attorney or any of the M.D.L. 55 attorneys acted unfairly or in bad faith with respect to Ohio. The court does not agree with the argument advanced by Ohio that the different po-

---

18. Wright & Miller, op. cit., state in § 1769: "Courts often have stated that the interests of the representatives must be coextensive with those of the class in order to satisfy Rule 23(a)(4). This does not mean that their positions have to be identical; rather, what seems to be intended by these judicial statements is that the representatives and the class members should share common objectives and legal or factual positions."

19. The situation is different from what it would have been if the class actions had proceeded through further pretrial to a possible trial or trials. Here we have not only a settlement, but a settlement which included special provisions with respect to the Ohio claims.

sitions taken by Ohio and the attorneys for the Class G defendants on several matters in the Chapter X proceedings created such an animosity or conflict as would, standing alone, prevent the class representatives in M.D.L. 55 from fairly and adequately protecting the interests of Ohio.

There is, however, the provision in the settlement preserving the claims of the M.D.L. defendants with respect to the Ohio transactions. See n. 12, above. As this court has found, those provisions were included with the expectation on the part of everyone that Ohio would opt out. Viewed in the light of Ohio's failure to opt out, those provisions cannot be justified. Indeed, Clark has offered to release his claims if Ohio's pending motion to be relieved from the judgment herein does not prevail. But the matter is not so simple; many claims, counterclaims, cross-claims and third-party claims, actual and potential, are involved.

■ When the differences between the claims of Ohio and other class members and the provisions of the order and judgment dealing specifically with the Ohio and Ohio-related claims are considered together, Ohio has made a strong case that the judgment should be held void as to all the claims of Ohio.

*Rule 60(b)(6)—Other Reasons Justifying Relief from the Operation of the Judgment*

To the considerations referred to in the last preceding paragraph must be added the lulling effect of the dealings which the attorneys for Ohio had with the attorney for the Chapter X Trustee and the attorneys for some of the M.D.L. 55 defendants, discussed under the heading "60(b)(1)—Excusable Neglect", above.

The court concludes that the totality of the evidence requires that Ohio be re-

lieved from the operation of the judgment.[20]

Ohio should be added to the list included in Exhibit A, referred to in paragraph H of the judgment entered herein on December 4, 1972, and will be bound by the provisions of said paragraph H.

Counsel should agree upon a proper order within 15 days.

---

20. This court intimates no opinion with respect to the possible res adjudicata or collateral estoppel effect of any prior decision in the Chapter X proceedings or elsewhere.